STANDARD INSURANCE Co. OF N.Y., et al. *v.* ANDERSON

No. 39991          March 26, 1956          86 So. 2d 298

*Wingo & Finch,* Hattiesburg; *Watkins & Eager,* Jackson, for appellants.

*Hannah, Simrall & Aultman, Cephus Anderson,* Hattiesburg, for appellee.

400

Lee, J.

Lawrence Anderson filed two separate suits in the Circuit Court of Forrest County to recover for fire

losses. One was against Standard Insurance Company of New York for coverage of $1,500 on merchandise and $1,500 on fixtures. The other was against New Hampshire Fire Insurance Company, whose policy provided coverage of $1,000 on merchandise and $2,000 on fixtures. The property was located in Anderson's store building just outside the corporate limits of the City of Hattiesburg.

The answers of the defendants denied the material allegations of the declarations, and pled specially as defenses in bar of the actions certain provisions of the policies, to wit: "This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein * * * The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examination under oath by any person named by this Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made. * * * IRON SAFE CLAUSE—Guarantee to keep books and inventories and to produce them in case of loss. * * * No suit or action on this policy for the recovery of any claim shall be sustainable in any Court of law or equity unless all the requirements of this policy shall have been complied with * * *". The effect of the special defenses was to charge a willful concealment of material facts and circumstances, the violation of the terms of the policy in the procurement of additional unauthorized insurance, and failure to comply with the terms of the iron safe clause.

The replications of the plaintiff denied the allegations of the answers. However, during the trial, the court permitted an amendment, which in effect raised the issue of waiver as to the iron safe clause and additional insurance. The court offered to continue the case because of the amendment, but the insurance companies desired to proceed.

The causes were consolidated and tried together. At the close of the evidence, the court sustained the requested peremptories of the insurance companies as to the coverage on merchandise in the total sum of $2,500, but refused them as to the $3,500 on fixtures. The cause was submitted to the jury, and it returned a verdict for the plaintiff in the total sum of $3,500 for the fixtures. The insurance companies appealed because of the court's denial of their requested peremptories as to the $3,500 on the fixtures. Anderson appealed because of the granting of the peremptory as to the $2,500 on merchandise.

The Standard policy was issued on February 25, 1953, by the Mike Ginsberg Insurance Agency, at which time policies in the amount of $10,500, including this one, were written to cover the building, fixtures and merchandise.

The New Hampshire policy was issued on June 15, 1953, by the Brock Insurance Agency, at which time policies in the amount of $10,500, including this one, were also written to cover the building, fixtures and merchandise.

The fire occurred between two and three o'clock A. M. on October 16, 1953, and the building and its contents were a total loss.

Anderson testified that he wished to purchase $21,000 of insurance on his property, and that Ginsberg came to his place and inspected it. When he said, "I see you do not have an iron safe," Anderson showed him an iron box, which he used for a safe and in which he kept his papers. Ginsberg then said that the iron box was

all right, that he would write $10,500 of insurance, and would send another agent to write the additional amount. The policies were written, Ginsberg delivered them the next day, and Anderson paid the premiums. The other agent did not come for some time. Ginsberg was trying to write insurance on Anderson's truck. Anderson declined to change this insurance at that time, but informed Ginsberg that the other agent had not written the additional insurance. Whereupon Ginsberg promised to send Robert Dunn for that purpose. Dunn came on June 15, 1953, explaining that he was the one to write the additional insurance, looked over the place, examined the iron box just as Ginsberg had done, took the outstanding policies to his office, wrote the additional insurance of $10,500 of that date, delivered them to Anderson, and he in turn paid the premiums. Several days later he apprised Ginsberg as to what had transpired. Mrs. Anderson corroborated her husband's version in detail; and two other witnesses also gave corroboration thereto.

On the cross-examination of Anderson, it was developed that he was examined under oath in the office of attorney Cephus Anderson on December 22, 1953, under the provisions of the policy, as provided for in the answers, supra. In that examination, on the advice of his counsel, Anderson refused to disclose when he purchased the property, or the consideration which he paid, or the amount of the acreage. He did exhibit his deed; but this showed the consideration to be $10 and other valuable considerations, the date as September 13, 1950, and the description by metes and bounds. He refused to answer whether he had competitors in the vicinity at the time of the purchase, or whether he had made efforts to sell the property before the fire, or whether he took out the insurance in the way in which it was issued by the Ginsberg Agency, or whether he attempted to obtain additional insurance from Ginsberg, or whether he ap-

plied for the New Hampshire policy or a general American Casualty Company policy, or whether he had any discussions with Ginsberg with reference to the insurance before the loss, and what occurred at the time of the fire.

Following the fire and notice thereof, J. M. Lewis, Jr., an adjuster for the several companies, went to the scene for the purpose of making an inspection. When Anderson produced his policies, Lewis observed that there appeared to be a policy violation as to additional insurance, and that he could not proceed with the investigation except under a nonwaiver agreement. While Anderson testified that Lewis told him at the time that the companies would not pay him anything, later, after talking with an attorney, the nonwaiver agreement was signed on October 27, 1953, by him and Lewis, as agent of the companies. The material part thereof was as follows:

"It is hereby agreed by and between the above named assured and the insurance companies whose names are signed hereto that anything done or to be done by said insurance companies, or on their behalf in connection with the above described loss, including any investigation into cause or amount of loss or damage or other matter relative thereto, shall not waive, invalidate, forfeit or modify any of their rights under the terms and conditions of the respective policies issued by them. This agreement is made further for the aid and convenience of the parties hereto, to permit investigation of the claim and ascertainment of appropriate values of and loss or damage to the property involved to be made without delay and without prejudice to any of their rights."

Mike Ginsberg, denying in detail Anderson's version, testified that $10,500 was full insurance; that there was no request for more, and he would not have written any more if he had been requested to do so; that he did not agree to send another agent to do so; and that he did

not send Robert Dunn. He denied any knowledge as to the iron box, or that he called Anderson about insurance on his truck. Robert Dunn did not testify.

At the threshold of this appeal, the Court is confronted with the effect of Anderson's refusal to answer questions, which were propounded to him under oath, in accordance with a specific provision of the policies, thereby concealing facts or circumstances concerning his insurance.

45 C. J. S., Insurance, Section 1024, pp. 1254-5 says: "Fire insurance policies generally contain a provision requiring insured, after the loss, or as often as demanded, to submit to examination under oath touching all matters material to the adjustment of the loss. Such a provision is reasonable and valid, and is to be given a reasonable interpretation. While compliance therewith is not a condition precedent to a recovery unless made so by the policy, under the terms of most policies, a failure to comply with it bars a recovery either by insured or by anyone claiming under or through him, in the absence of any excuse for noncompliance.

"The requirement contemplates an examination of insured personally, and none other can take his place. While insured's refusal to submit to an examination is not final, and may be retracted within a reasonable time by a subsequent offer to submit, where, during the examination, insured refused to answer material questions, he cannot recover on the policy, although at the close of his testimony at such examination he stated that he would not refuse to answer any reasonable question. * * *"

In Claflin, et al. v. Commonwealth Insurance Company, et al., 110 U. S. 81, 28 L. Ed. 76, Frances E. Barrett, the original policyholder, assigned the policies to William Murphy, who, after the loss, assigned them to the plaintiffs in error. In an examination under oath, under a provision of the same effect as that involved in the policies here in question, Murphy swore that he

purchased the stock of goods for $35,484.20, paying for same in cash and securities, and that no other person had an interest therein, when the value thereof did not exceed $18,000; and that the property was damaged to the extent of $26,827.06, when such damage did not exceed $5,000. In other words, his statement under oath was false; but his explanation was that he made it because of a statement which he had given to a commercial agency a day or two after his purchase with a view of obtaining commercial credit. The trial judge instructed the jury that: "* * * these Companies had a right to have from him the truth about every matter that was material as evidence to show whether he owned these goods or not; they had a right to have the truth from him whatever his intentions might have been, that is, as far as the truth was material; and so far as his testimony before the notary had a tendency to mislead the Companies on an important matter, it was false swearing and false testimony within the meaning of the policy, and would avoid the policy. If he stated that which was intended for their action, and which would probably influence their action, and these statements were false, then he swore falsely within the meaning of the policy, though he didn't intend to cheat them, but intended to cheat somebody else, for, without looking to his motives, the Company had a right to an honest statement from him to all questions, that went to show whether he was the owner of these goods or not." The opinion, in upholding the instructions and in affirming the case said:

"The object of the provisions in the policies of insurance, requiring the assured to submit himself to an examination under oath, to be reduced to writing, was to enable the Company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to its rights, to enable it to decide upon its obligations, and to protect it against false claims. And every interrogatory

that was relevant and pertinent in such an examination was material, in the sense that a true answer to it was of the substance of the obligation of the assured. A false answer as to any matter of fact, material to the inquiry, knowingly and willfully made, with intent to deceive the insurer, would be fraudulent. If it accomplished its result, it would be a fraud effected; if it failed, it would be a fraud attempted. And if the matter were material and the statement false, to the knowledge of the party making it, and willfully made, the intention to deceive the insurer would be necessarily implied, for the law presumes every man to intend the natural consequences of his acts. * * * By that contract, the Companies were entitled to know from him all the circumstances of his purchase of the property insured, including the amount of the price paid and in what manner payment was made; and false statements, willfully made under oath, intended to conceal the truth on these points, constituted an attempted fraud by false swearing which was a breach of the conditions of the policy, and constituted a bar to the recovery of the insurance.''

In Phoenix Insurance Company v. Summerfield, 70 Miss. 827, 13 So. 254, this Court said: ''We concur in the view held in Claflin v. Insurance Company'', supra, though upholding liability in that case on a wholly different theory.

In Claxton v. Fidelity & Guaranty Fire Corporation, 179 Miss. 556, 175 So. 210, because Claxton swore falsely in an examination held under the terms of his policy, similar to the ones here, with reference to the value of certain personal property, it was held that the chancellor was correct in rejecting his claim for the loss of such personal property.

In Home Insurance Company of New York v. Cavin, 162 Miss. 1, 137 So. 490, the insured, in his application, disclosed only one previous fire when he had actually had three others. Under the terms of his policy, a false

answer thereto rendered it void. Consequently the Court held that the insurance company was not liable.

See also Hickman v. London Assurance Corporation, 184 Cal. 524, 195 Pac. 45, 18 A. L. R. 742; Robinson v. National Automobile & Casualty Insurance Company, 282 Pac. 2d 930; Gipps Brewing Company v. Central Manufacturers Mutual Insurance Company, C. C. A. 7th, 147 Fed. 2d 6; Happy Hank Auction Company v. American Eagle Fire Insurance Company, 145 N. Y. S. 2d 206.

■■ ■ On November 18, 1954, Bruce C. Aultman, an attorney for the plaintiff, by letter advised counsel for defendants that he was tendering Anderson to them for reporting to the defendants such information as they might see fit to ask or require. However, this letter was written following the mistrial of a case against another insurance company, the cause of action having arisen from the same fire. This offer came entirely too late. Any benefits, which could have been discovered from the examination on December 22, 1953, had long since perished and could not have been resurrected as a result of compliance with this belated offer. Wagley v. Colonial Baking Company, 208 Miss. 815, 45 So. 2d 717.

■■ ■ In the Claflin and Claxton cases, supra, the policyholders made false statements in the examination under oath. In the case here, Anderson deliberately refused to answer questions on matters which were material, and thus willfully concealed such material facts and circumstances. The policy prohibited both concealment and misrepresentation. Consequently his concealment operated, under the provisions of the policy, to deny and defeat his right to recover under them.

Hence we do not reach the question of waiver by the insurance companies of the provisions as to additional insurance or the iron safe clause.

From which it follows that the defendant insurance companies were entitled to a directed verdict, not only

as to recovery for the loss of merchandise, but also on a recovery for loss of fixtures.

The judgment of the court on the peremptory in favor of the insurance companies denying recovery for the loss of merchandise is affirmed.

The judgment of the court in refusing a peremptory for the insurance companies as to the item of fixtures, and submitting the cause to the jury on that question, is reversed, and judgment will be entered here in favor of the appellants.

Affirmed in part; and in part reversed and judgment here for the appellants.

*McGehee, C. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.