306 So.2d 638 (1974)
Cecil F. TAYLOR
v.
FIREMAN's FUND INSURANCE COMPANY.
No. 47743.
Supreme Court of Mississippi.
December 23, 1974.
Rehearing Denied February 10, 1975.
*639 Davey L. Tucker, Jackson, for appellant.
Watkins & Eager, Jackson, for appellee.
ROBERTSON, Justice:
Cecil F. Taylor brought suit against Fireman's Fund Insurance Company in the Circuit Court of the First Judicial District of Hinds County, Mississippi, to recover $10,000, the full amount of the coverage on a house that had burned. Taylor claimed that he was the sole owner of the house, that it was a total loss, and that in addition to the $10,000 coverage he was entitled to recover $390 loss of rent and $5,000 punitive damages.
Fireman's Fund pleaded as an affirmative defense the failure of Mr. Taylor to comply with these provisions of the insurance policy:
"This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in the case of any fraud or false swearing by the insured relating thereto.
......
"[W]ithin sixty days after the loss, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following: the time and origin of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupation, location, possession or exposures of said property since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss ... The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; ... ." (Emphasis added).
When both sides rested, the defendant moved for a peremptory instruction, and the court sustained defendant's motion.
Appellant assigns as error:
1. The granting of the peremptory instruction.
2. The failure of the trial court to find that appellee was estopped by its conduct from denying liability.
3. The use of the examination under oath to void the policy.
4. The admitting into evidence of Appellee's answers to appellant's interrogatories.
Cecil F. Taylor testified that on April 25, 1972, he called Matthew W. Thomas, Jr., of the Statewide General Insurance Agency, and said:
"Well, I told Mr. Thomas  I called him and told him I'd just bought a house on Barrett Street, 1840 Barrett, and I would like to get some insurance on it. And he asked me how much did I want on it, and I told him $10,000 because *640 that's what I'd paid for it, you know, and I wanted something to cover the amount I'd paid for it. So I give him the address and he said he would check it and get back with me. So then he called me and told me what the insurance would be, and I paid him the premium, or part of the premium, and he sent me the policy." (Emphasis added).
The policy issued in accordance with Taylor's request shows "Mr. Cecil Taylor, 1840 Barrett Street, Jackson, Mississippi" as the sole insured. The amount of insurance against fire shown in the policy was $10,000.
The Warranty Deed dated May 6, 1972, and recorded on May 10, 1972, recited that the property was conveyed to "MAUDE L. TAYLOR, A SINGLE WOMAN, AND CECIL F. TAYLOR, as joint tenants with full rights of survivorship and not as tenants in common,".
Cecil Taylor testified at the trial that he went all through the house on May 13, 1972. The house was completely destroyed by fire about 3:00 A.M. May 15, 1972. Taylor testified at the trial that he contacted his insurance agent, Thomas, and Thomas had R.L. Hewitt of the General Adjustment Bureau get in touch with appellant. Taylor testified that after the fire he went through the house and that the kitchen was almost burned off from the rest of the house.
Taylor, on May 23, 1972, signed a Non-Waiver Agreement, which recited:
"IT IS AGREED that any action taken by the insurance company, or companies, signing this agreement in ascertaining the amount of the actual cash value; and the amount of the loss and damage which occurred May 14, 1972, to Dwelling located at 1840 Barrett Street, Jackson, Mississippi and in investigating the cause thereof, shall not waive or invalidate any of the conditions of the policies of insurance, and shall not waive or invalidate any rights whatever of any party to this agreement.

"NOTICE, is hereby given and accepted, and it is hereby mutually understood and agreed, that no representative of any insurance company signing this agreement has power or authority to waive any of the conditions of their respective policies, unless such waiver be specifically made in writing.

"THE SOLE OBJECT AND INTENT of this agreement is to provide for the determination of the amount of the actual case value and the amount of the loss and damage, and an investigation of the cause thereof, without regard to the liability of said insurance companies, and to preserve all the rights of the insurance company, or companies, and the insured." (Emphasis added).
Taylor testified that Hewitt advised him that he had found from the Land Records that Cecil Taylor only owned a 1/2 interest in the property at 1840 Barrett Street, and that Fireman's Fund could not pay him over $5,000 as a part owner. Taylor testified that he refused to accept that amount and demanded $10,000, the full amount of the policy.
Appellant testified that the appellee gave him notice of a hearing to be held in accordance with the terms of the policy, and that such hearing was held on August 18 and 21, 1972. Taylor was placed under oath and questions and answers were reduced to writing and subscribed to by Taylor before his attorney, Davey L. Tucker, on August 28, 1972.
At the close of the direct examination of Taylor at the trial in lieu of cross-examination, appellee offered as an exhibit the written transcript of the hearings on August 18 and 21, 1972, and the entire transcript was admitted into evidence.
The transcript recites in part:
Q Who is Maude L. Taylor?

*641 A That's my aunt.
Q Why was she named as one of the grantees in this deed?
A Well, the reason why is we do a lot 
BY MR. TUCKER: Joint venture.
A  of joint venture and 
(Discussion off the record)
Q Now, why was she named as one of the grantees?
A Well, as I stated, we do joint venturing on various pieces of property. We buy and trade, you know, together sometime, property.
Q How much did she pay on the purchase price?
A How much did she pay on the purchase price?
Q Uh huh.
A Not anything at all.
Q I understand you to say that she advanced the $9,500.00 that you sent to Mr. Jefferson?
A Yeah, I said I borrowed it from her.
Q Then she paid nothing on the purchase price?
A No. I just  This is a transaction that  In other words, well, maybe I can explain it to you better. On various pieces of property if I think she can transact it for me a little better than I can then I use her, you know. And if I can transact some better for her, then she uses me. So that's the way we do.
Q Well, on this deed you put both names on the deed.
A Right, because I had her transacting the property with me, also.
Q Have you repaid her the $9,500.00 you borrowed?
BY THE WITNESS: Should I answer that?
BY MR. TUCKER: Yeah.
A No, I haven't paid her all of it.
Q Have you paid her any of it?
A Yes.
Q How much?
A $4,000.00 on it, I believe.
Q Did you sign a note to her for the $9,500.00?
A Yes. I signed a check.
Q A check?
A Right.
Q On what Bank?
A On the First National Bank.
Q In Jackson?
A Right.
Q And she holds that check?
A That's correct.
Q Has she deposited that check?
A No.
Q Did you have an account in the First National Bank in Jackson when you signed that check?
A Yes.
Q Did you have that much money in it?
A At the time I signed the check?
Q Yes.
A No.
Q Have you had that much in it since?
BY MR. TUCKER: Don't answer.
A I refuse to answer.
Q Do you have that much in it now?

*642 BY MR. TUCKER: No answer.
A I refuse to answer that, also.
Q How did you pay the $4,000.00 that you say you have repaid Maude L. Taylor?
BY MR. TUCKER: No answer.
A I refuse to answer that.
Q Now, the property in question was damaged by fire May 14, 1972, is that correct?
A I believe so, right.
Q On or about May 25, 1972, Mr. R.L. Hewitt of General Adjustment Bureau discussed this fire loss with you, did he not?
A That's correct.
Q At that time you told him that Maude L. Taylor was your aunt and that she then owned a fifty-fifty interest in the house, did you not?
A I believe I might have made the statement to him that way.
Q Well, don't you know that you did?
A I don't recall. It has been such a pretty good while since we've been prolonging with this situation, I don't recall exactly whether I made the statement to him.
Q Do you deny making that statement to him?
A I don't deny it. I don't recall exactly how I made it.
Q Again on July 7, 1972, Mr. Hewitt came and talked to you about this thing again, didn't he?
A I don't remember the exact date but he came back and talked to me.
Q In July?
A I don't recall the date. I don't.
Q About a month ago?
A That I talked to him?
Q Yes.
A I tried to correspond with him on the telephone several times back at the office, but I don't recall what date it was and I don't recall what date it was I talked to him on the phone.
Q Well, on or about July 7, I want to ask you if you didn't tell Mr. Hewitt, again, that you and Maude L. Taylor owned the property fifty-fifty?
A I don't recall telling him that. I might have. As I've stated my deeds will show that when I told you there was a lot of transaction that we do, and if there was a question about why was her name on there, then I might have said it. I'm not sure, you know, the way I said it to him.
Q On neither of those occasions did you tell Mr. Hewitt anything about a deed from Maude L. Taylor to you, did you?
A No, he didn't ask me.
Q He was asking you who owned the property and on both of those occasions you told him you and Maude L. Taylor owned it fifty-fifty, didn't you?
BY MR. TUCKER: Don't answer, Cecil.
A I refuse to answer that. I don't remember telling him that.
Q Do you have a deed from Maude L. Taylor covering this property?
A Yes.
Q May I see that deed?
(Mr. Tucker hands Mr. Watkins deed.)
Q Your Attorney has handed me what's entitled a "Quitclaim Deed" which purports to be dated May 8, 1972, and which purports to have been executed by Maude L. Taylor. Is this the deed from Maude L. Taylor to you?

*643 A That is it, right.
......
Q Why was this deed executed?
A Why was the deed executed?
Q Uh huh.
BY MR. TUCKER: No answer.
A I refuse to answer that question.
Q When was it executed?
A On the date that is showed on there.
Q On May 8th, 1972?
A Right.
Q Were you present?
A Yes, I was.
Q Who else was present?
A Before my attorney and Maude L. Taylor.
Q You and Mr. Tucker and Maude L. Taylor were present?
A Right.
Q It purports to have been acknowledged by your attorney, Mr. Davey L. Tucker, on May 8, 1972. Was it acknowledged on that date?
BY MR. TUCKER: No answer.
A I refuse to answer that.
Q What was the consideration for this quitclaim deed?
BY MR. TUCKER: No answer.
A I refuse to answer.
Q When was this deed delivered to you, executed and acknowledged?
BY MR. TUCKER: The same date.
A The same date.
Q On May 8, 1972?
A That's right.
Q Who recorded in the office of the Chancery Clerk the Warranty Deed dated May 6, executed by James Jefferson and Sarah Jefferson?
A My attorney handles all of that for me.
Q Mr. Tucker recorded it?
A Right.
Q I note that the deed from James Jefferson was recorded on May 10, 1972, are you familiar with that fact?
BY MR. TUCKER: No. You don't know the answer.
A Right.
Q Why wasn't the quitclaim deed from Maude L. Taylor recorded at the same time?
A I don't know. I leave that in my attorney's hands, you know.
Q Did you instruct your attorney to record both deeds?
A No. I didn't instruct him to do it. I'm sure that he knows what's his job to do so I didn't have to instruct him.
Q Why hasn't the quitclaim deed from Maude L. Taylor ever been recorded?
A I don't know.
Q The truth is that it wasn't executed until July, long after the fire of May 14, 1972, isn't it?
BY MR. TUCKER: No answer.
A I refuse to answer that.
Q Will you submit you aunt, Maude L. Taylor, for examination under oath on your behalf on this matter?
BY MR. TUCKER: No answer.
A I refuse to answer that, also.
......
Q When were you last in the house before the fire of May 14, 1972?
A What date? Let me see. I had checked by and they had moved and I'm *644 trying to think what date was that. I don't recall what day it was. It was the day I had checked by and they had moved.
Q Was that the day before the fire?
A No.
BY MR. TUCKER: No answer.
A I refuse to answer what day.
Q Was there any inflammable in the house on May 14, 1972?
A I don't recall. Not that I recall.
Q What was the cause of the fire?
BY MR. TUCKER: No answer.
A I don't know. I refuse to answer.
Q Do you know that there was evidence of an inflammable in the kitchen at the time of the fire?
BY MR. TUCKER: No answer.
A I refuse to answer.
Q What was your financial condition on May 14, 1972?
BY MR. TUCKER: No answer.
A I refuse to answer that.
Q May I see a copy of your 1971 income tax return?
A No.
Q You refuse to furnish that?
(Witness nods head affirmatively.)
Q You did file a return?
A I refuse to furnish it and refuse to answer that.
BY MR. WATKINS: I believe that's all.
The questions asked were about these material and important matters:
1. The title to the property.
2. The amount paid for the property.
3. The source of the funds used to purchase the property.
4. The consideration for the quitclaim deed.
5. The validity of the quitclaim deed.
6. The circumstances surrounding the fire which occurred twenty days after the effective date of the policy and five days after the recording of the warranty deed to Taylor and his aunt.
The insured was required to answer these questions fully and completely, to give the best information he had about these matters.
In Southern Guaranty Insurance Co. v. Dean, 252 Miss. 69, 172 So.2d 553 (1965), the insurance policy involved contained the exact same provisions for a sworn examination of the insured before trial. In Southern, the trial court held that the policy had not been voided by the actions of the insured. This Court, in reversing, said:
"We hold that insured failed and refused to answer questions in the examination under oath on matters which were material and relevant to the insurance and the loss, and failed and refused to produce for examination written documents which were pertinent and material to the insurance and loss. Failure of insured to comply in material respects with these contractual clauses bars her recovery under the policies. Hence the decree of the chancery court is reversed, and judgment is rendered here for appellants." 252 Miss. at 72, 172 So.2d at 554.
......
"It is well established that such clauses in fire insurance policies are reasonable and valid, and are to be given a reasonable interpretation. If breached, the insurer would be deprived of a valuable right for which it contracted. Moreover, in an examination of the insured, all of those matters are material which have a bearing on the insurance and the loss. *645 The insured is required to give the best information obtainable. 5 Appleman, Insurance Law and Practice §§ 3549, 3552 (1941); 45 C.J.S. Insurance §§ 1023, 1024 (1946)." 252 Miss. at 76, 172 So.2d at 556. (Emphasis added).
The definitive case in Mississippi on this subject is Standard Insurance Co. v. Anderson, 227 Miss. 397, 86 So.2d 298 (1956). In Anderson this Court quoted with approval from Claflin v. Commonwealth Insurance Co., 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76 (1883):
"The object of the provisions in the policies of insurance, requiring the assured to submit himself to an examination under oath, to be reduced to writing, was to enable the Company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to its rights, to enable it to decide upon its obligations, and to protect it against false claims. And every interrogatory that was relevant and pertinent in such an examination was material, in the sense that a true answer to it was of the substance of the obligation of the assured... . By that contract the companies were entitled to know from him all the circumstances of his purchase of the property insured, including the amount of the price paid and in what manner payment was made; and false statements, willfully made under oath intended to conceal the truth on these points, constituted an attempted fraud by false swearing which was a breach of the conditions of the policy, and constituted a bar to the recovery of the insurance." 227 Miss. 407-408, 86 So.2d at 301-302. (Emphasis added).
......
"In the Claflin and Claxton cases, supra, the policyholders made false statements in the examination under oath. In the case here, Anderson deliberately refused to answer questions on matters which were material, and thus willfully concealed such material facts and circumstances. The policy prohibited both concealment and misrepresentation. Consequently his concealment operated, under the provisions of the policy, to deny and defeat his right to recover under them." 227 Miss. at 409, 86 So.2d at 302. (Emphasis added).
To the same effect is Anderson v. American & Foreign Ins. Co., 227 Miss. 324, 86 So.2d 303 (1956), a companion case.
In Boston Insurance Co. v. Mars, 246 Miss. 36, 148 So.2d 718 (1963), we closed our opinion with these words:
"We think that the refusal of the insureds to submit to the examination under oath was a violation of the express provisions of the insurance policy, and resulted in a forfeiture of their right to recover under the policy; and that, therefore, the appellant was entitled to the requested peremptory instruction in its favor." 246 Miss. at 43, 148 So.2d at 720.
The circuit court was correct in peremptorily instructing the jury to find for the defendant.
The appellant next contends that the appellee was estopped by its conduct from denying liability on appellant's claim. There is no merit to this contention. Also we note from the record that the appellant signed a non-waiver agreement on May 23, 1972, and this Court upheld the validity of similar non-waiver agreements in Standard Insurance Co. v. Anderson, supra, and Anderson v. American & Foreign Ins. Co., supra.
Appellant also contends that the trial court erred by admitting into evidence appellee's answers to appellant's interrogatories, and by admitting into evidence the transcript of the pre-trial contractual examination under oath. Appellee's answers were properly admitted under the authority of Maness v. Illinois Central Railroad Company, 271 So.2d 418 (Miss. 1972) and *646 Standard Life & Accident Insurance Company v. Tinney, 73 Miss. 726, 19 So. 662 (1896).
When the transcript of appellant's examination under oath was offered into evidence, the appellant identified the transcript and the only comment made by appellant's counsel was "No objection, Your Honor". In addition, this Court held these examinations admissible for examination by the trial court and by this Court on appeal in Southern Guaranty Insurance Co. v. Dean, supra; Boston Insurance Co. v. Mars, supra; Anderson v. American & Foreign Insurance Co., supra; Standard Insurance Co. v. Anderson, supra, and Claxton v. Fidelity & Guaranty Fire Corp., 179 Miss. 556, 175 So. 210 (1937).
The judgment of the trial court is affirmed.
Affirmed.
GILLESPIE, C.J., and PATTERSON, SMITH and BROOM, JJ., concur.
RODGERS, P.J., and INZER, SUGG and WALKER, JJ., dissent.
RODGERS, Presiding Justice (dissenting).
The instant appeal arises from a suit by the appellant, Cecil F. Taylor, against the appellee, Fireman's Fund Iusurance Company. Mr. Taylor sued Fireman's Fund in the First Judicial District of the Circuit Court of Hinds County, Mississippi, for collection on a fire insurance poicy issued by Fireman's Fund which covered a house owned by Mr. Taylor which had burned. At the close of the case, the court granted the defense's request for a peremptory instruction. Verdict and judgment were in favor of the defendant. From this judgment Mr. Taylor appeals.
In February of 1972, the appellant, Cecil F. Taylor, and his aunt, Maude L. Taylor, began negotiations to purchase a house and lot located at 1840 Barrett Street, Jackson. On April 24 or 25, these parties entered into a purchase contract with James R. Jefferson, the owner of the house and lot. The house was purchased for nine thousand five hundred dollars ($9,500.00). Five hundred dollars ($500.00) had been paid previously to the realtor. Maude L. Taylor supplied the nine thousand five hundred dollars ($9,500.00). On April 25, appellant, Cecil F. Taylor, purchased from Matthew W. Thomas, Jr., an agent for Fireman's Fund Insurance Company, a ten thousand dollar ($10,000.00) fire insurance policy on the house at 1840 Barrett Street. On May 6, Mr. Jefferson executed the warranty deed. The grantees were Cecil F. Taylor and Maude L. Taylor as joint tenants. On May 8, Maude L. Taylor quitclaimed all of her interest in the property to Cecil F. Taylor. The warranty deed from Mr. Jefferson was recorded on May 9. The quitclaim deed had not been recorded as of the time of trial.
At the time Maude Taylor and Cecil Taylor purchased the house it was being rented to Mr. Roy Perry. Sometime around May 11 or 13, Mr. Perry moved out of the house without notifying Mr. Taylor. Mr. Taylor visited the house on May 13 and found Mr. Perry had gone. At approximately 3:00 A.M. on the morning of May 15, the house burned. It is said that some unknown firemen reported evidence of an inflammable in the kitchen, but no such evidence was offered by the insurance company.
After Mr. Taylor was notified of the fire, he contacted Mr. Matthew Thomas who had sold him the fire insurance policy on the house. Mr. Thomas told Mr. Taylor that he would have an agent of Fireman's Fund contact him. R.L. Hewitt, an adjuster with General Adjustment Bureau, contacted Mr. Taylor that same day. After talking to Mr. Hewitt, Mr. Taylor had an estimate of repair made on the house. This estimate was nine thousand six hundred thirty-seven dollars and fifty cents ($9,637.50). On May 23, Mr. Taylor and *647 Mr. Hewitt, on behalf of Firemen's Fund, entered into a non-waiver agreement.
Approximately one month later, around July 1, Mr. Hewitt informed Mr. Taylor that according to the land deed records, Mr. Taylor owned only a one-half (1/2) interest in the property and could be reimbursed for only one-half (1/2) of its value, or five thousand dollars ($5,000.00). Subsequently Mr. Taylor's attorney sent Mr. Hewitt a copy of the quitclaim deed from Maude Taylor to Cecil Taylor.
After the copy of the quitclaim deed was sent, Mr. Watkins, attorney for Fireman's Fund, requested Mr. Taylor to submit to an examination under oath as required in the fire insurance policy. The policy of insurance involved contains the following provisions:
"The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; ...
* * * * * *
This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."
On August 18, 1972, Fireman's Fund exercised its right to examine the insured, Mr. Taylor, under oath in the presence of his attorney. During the examination it developed that Mr. Taylor's attorney had not brought the correct file with him and the examination was recessed until August 21.
In the early part of the examination the following request was made by appellant's attorney:
"BY MR. TUCKER: Before we go further, could we have something off the record just a minute. Let us get a clarification as to what we are doing.
BY MR. WATKINS: Let's go off the record."
The meeting was recessed.
"BY MR. TUCKER: And for convenience purposes, I would appreciate it if you would just tell me what you would like for me to bring, I'll be happy to bring it.
BY MR. WATKINS: All right, sir, let's make a record of this, if you will. I want all correspondence in connection with this purchase, either before or after; I want all contracts of stale, all deeds, all insurance policies, all cancelled checks or evidences of payment, and a copy of Mr. Taylor's income tax return for the year 1971.
BY MR. TUCKER: Can you tell me what the purpose of the income tax returns are?
BY MR. WATKINS: Mr. Tucker, as I stated at the outset, I'm not in a position to answer any question.
BY MR. TUCKER: Well, whichever of these I decide are necessary, I'll bring with us at that time and let him finish answering questions on these things.
BY MR. WATKINS: Fine."
In the course of the examination, Mr. Taylor, on advice of his attorney, refused to answer several questions propounded by the attorney for Fireman's Fund.
Due to the refusal of Fireman's Fund to pay his insurance claim, appellant, Mr. Cecil Taylor, brought suit in the Circuit Court of Hinds County. The defendant/appellee, Fireman's Fund Insurance Company, filed as an affirmative defense to the suit the refusal of Mr. Taylor to answer certain questions under oath in violation of the terms of the policy. During the course of the trial, the trial court *648 allowed interrogatories submitted by the plaintiff/appellant (and the answers thereto) and the contractual examination under oath of Mr. Taylor to be admitted into evidence. A peremptory instruction was granted in favor of the defendant/appellee at the close of testimony and a judgment rendered in its favor. From this adverse judgment Mr. Taylor appeals.
The trial judge granted a peremptory instruction and made the following statement:
"BY THE COURT: The air of this case from the very beginning, to put it just as mildly as it can be put, appears to be one of uncertainty, one of lack of clarity to the Court. It appears that, to put it mildly as I know how without making any charges against anybody, that the plaintiff's case is tainted with so much doubt and suspicion and inferences as to bring it within the rule laid down in the cases cited by Mr. Watkins. I have the honest feeling that the proper thing to do is to sustain his motion, which the Court will do."
The issue, then, is whether or not a peremptory instruction in favor of the insurance company should have been given without proof.
The appellee insurance company contends that the appellant wilfully refused to answer the following questions which, it contends, were material facts, and that the appellant wilfully concealed material facts:
(1) The identity of the bank or banks in which he had accounts at the time he bought the property. This was later answered.
(2) The amounts in his bank account at all times since he gave his aunt a check for nine thousand five hundred dollars ($9,500.00).
(3) How he repaid the four thousand dollars ($4,000.00) to his aunt, Maude L. Taylor.
(4) Why the quitclaim deed of May 8, 1972 from Maude L. Taylor to him was executed.
(5) Whether said quitclaim deed was acknowledged before Davey L. Tucker, Notary Public, on May 8, 1972.
(6) The consideration for the quitclaim deed of May 8, 1972.
(7) Whether the quitclaim deed of May 8, 1972, was actually executed in July, 1972.
(8) Whether he was in the house described in the policy during April, 1972. He later testified that he was in the house on April 13.
(9) When he was last in said house before the fire on May 14, 1972.
(10) Whether he knew of an inflammable in the kitchen at the time of the fire. He said he didn't know.
(11) His financial condition at the time of the fire.
(12) Copy of his 1971 income tax return.
The appellee argues on appeal that the mere failure to answer these questions automatically voided the policy, and in support of this argument the appellee has cited the following cases: Standard Insurance Co. v. Anderson, 227 Miss. 397, 86 So.2d 298 (1956), and Southern Guaranty Insurance Co. v. Dean, 252 Miss. 69, 172 So.2d 553 (1965).
We have examined these two cases in detail. The original record in the Anderson case has been lost and we were unable to read the testimony from the record. The opinion, however, shows that the facts were developed before a jury. The trial judge did grant a peremptory instruction at the close of the testimony as to part of the claim. On appeal to this Court we held that the trial judge should have granted a directed verdict on the whole case because of the failure of the insured to answer *649 questions as to the amount paid for the property, and when he purchased the property; or the amount of acreages; or whether he attempted to sell the property before the fire; or whether he attempted to obtain additional insurance; and similar questions. Under the facts developed in that case, this Court determined that the questions were material and that the failure to answer to show whether the claimant owned the goods or not and what his interest may have been in the property, was material. The Court in the Anderson case quoted from 45 C.J.S. Insurance § 1024, at 1254-1255 (1946), as follows:
"Fire insurance policies generally contain a provision requiring insured, after the loss, or as often as demanded, to submit to examination under oath touching all matters material to the adjustment of the loss. Such a provision is reasonable and valid, and is to be given a reasonable interpretation. While compliance therewith is not a condition precedent to a recovery unless made so by the policy, under the terms of most policies, a failure to comply with it bars a recovery either by insured or by anyone claiming under or through him, in the absence of any excuse for noncompliance.
The requirement contemplates an examination of insured personally, and none other can take his place. While insured's refusal to submit to an examination is not final, and may be retracted within a reasonable time by a subsequent offer to submit, where, during the examination, insured refused to answer material questions, he cannot recover on the policy, although at the close of his testimony at such examination he stated that he would not refuse to answer any reasonable question. * * *" 227 Miss. at 406, 86 So.2d at 300-301.
The point is: The court had before it the evidence as to whether or not the questions were material.
We do have the original record in the case of Southern Guaranty Insurance Co. v. Dean, 252 Miss. 69, 172 So.2d 553 (1965). This case brings into focus a clear picture of the proper procedure to be followed when an affirmative defense is offered based upon the refusal of an insured claimant to answer material questions.
In Dean, the insurance companies offered twenty (20) witnesses to show the materiality of the questions previously propounded to the insured. They not only showed that the questions were material, but they also showed sufficient evidence to establish fraud and concealment. They offered much evidence to show that the fire was caused by an explosion; that the explosion was caused by open gas jets; that the insured obtained additional insurance on the property; that she tried to sell the property; that it was not the property of the insured; that before the fire, claimant's husband was seen to enter the building on Sunday afternoon before the fire; all of which she denied. They also showed that the additional insurance was an excessive amount. The chancellor pointed out that there were many serious circumstances in the case "which [this Court said] certainly justified the defenses of arson and over-insurance." 252 Miss. at 76, 172 So.2d at 555. From the evidence in the record this Court could reasonably determine that the questions asked the claimant were not only material, but that a concealment of the information was in fact fraud.
The case of Boston Insurance Co. v. Mars, 246 Miss. 36, 148 So.2d 718 (1963), is not applicable here because in that case the insured refused to answer any questions except those presented in writing. Moreover, in that case the insurer tendered to the insured his premiums previously paid to the insurer.
I am of the opinion that the trial court was in error in granting a directed verdict in favor of the insurance company at the close of the complainant's testimony in the instant case for the following reasons.
*650 First  the defense pleaded by the insurance company is an affirmative defense, and the burden of proof is upon the insurance company to show not only that the questions asked were not answered, but also to show that the questions were material and that the failure to answer amounted to willful concealment of a material fact.
In 44 Am.Jur.2d Insurance § 1494, at 359-60 (1969), the author has this to say:
"Upon an examination, the insured need not answer immaterial questions, and, assuming the good faith of the insured in refusing to answer questions propounded to him in the examination, on the ground that they are immaterial, a subsequent determination by the court that the questions were material should not result in the forfeiture of the insured's rights under the policy; the ruling should be, in effect, that the action cannot be maintained until the insured has answered such questions.
Where it is claimed that the insured fraudulently set the fire which caused the loss, the refusal of the insured to answer questions about a large amount of money of which he claimed to have been robbed at the time of the fire, which was not covered by the insurance, does not warrant a forfeiture of the rights of the insured under the policy. Nor is an insured bound to state the amounts for which he has settled with other insurers." (Footnotes omitted).
See also 29A Am.Jur. Insurance § 1413, at 522 (1960).
14 G. Couch, Cyclopedia of Insurance Law § 49:732, at 198 (2d ed. 1965), has this to say:
"However, it has been held that where a fire insurance policy reserves to the insurer the right to a personal examination of the insured, by providing that the insured must submit to an examination when requested by the company, and further provides that an action cannot be maintained until there has been full compliance with the terms of the policy, refusal to answer material questions does not work a forfeiture, in the absence of express provision therefor, but an action cannot be prosecuted until such questions are answered."
I am aware that our Court said in Standard Insurance Co. v. Anderson, supra, that a letter written by the attorney for the insured offering to submit the claimant for examination came too late after one trial had commenced against another company. I do not conceive that this ruling changes the general rule, because the offer came after the insured had a reasonable opportunity to answer the questions in court. Moreover, it will be noted that the Court in Anderson adopted the general rule mentioned above in 45 C.J.S. Insurance § 1024, at 1255 (1946), wherein it is said that the "insured's refusal to submit to an examination is not final, and may be retracted within a reasonable time by a subsequent offer to submit... ." 123 Miss. at 406, 86 So.2d at 301.
The appellant had notice that the insurance company contended that he owned only a one-half (1/2) interest in the property destroyed by fire. Consequently any questions that indicated he did not own more than a one-half (1/2) interest in the property were relevant and perhaps material, but it was for the court to determine whether or not they were a fraudulent or willful concealment.
The questions asked and refused an answer were as follows:
(1) "Q. In what Banks did you have bank accounts at the time you bought this property?" Defendant refused to answer. He said he had an account in First National Bank of Jackson.
(2) Appellant said he got the $9,500.00 from his aunt. He was asked: "Q. How did it happen to be in cash. Where did she keep it?" The attorney advised the appellant to refuse to answer.
*651 (3) He was asked if he had as much as the amount of the check in the bank since he signed a check to his aunt. He refused to answer.
(4) He also refused to state whether he had that much in the bank at the time of the examination. He later said he did not.
(5) He was asked how he paid the four thousand dollars ($4,000.00) which he paid to his aunt. He refused to answer.
(6) He was asked why the quitclaim deed was executed. He refused to answer.
(7) He was asked if the quitclaim deed was acknowledged before his attorney. He refused to answer.
(8) He refused to say what the consideration was for the quitclaim deed.
(9) He refused to answer whether the quitclaim deed was made until July, long after the fire of May 14, 1972.
(10) He refused to say that he would submit his aunt for examination under oath.
(11) He was asked if he was in the house in April. He refused to answer. He later said he was last in the house after his tenants had moved before the fire, but not the day before the fire; however, on advice of his attorney, he refused to answer. On the trial, he said he was in the house on May 13, 1972.
(12) He was asked if there were any inflammables in the house on May 14. He said, "I don't recall, not that I recall."
(13) "Do you know that there was evidence of an inflammable in the kitchen at the time of the fire?" Appellant said:
"I refuse to answer." But, on trial, he said he did not see anything out of the ordinary.
(14) He was asked: "What was the cause of the fire?" His lawyer said, "No answer," but he answered, nevertheless: "I don't know. I refuse to answer."
It will be observed that all of the questions except the last three were addressed to the appellant by appellee to determine whether or not he owned the entire property. There has been no indication to insured that the deed to him did not convey a one-half (1/2) interest. In fact, appellee's second defense admits that the insured owned a one-half (1/2) interest in the property.
But, the insurance company says: "There was evidence of an inflammable in the kitchen of said house at the time of the fire."
In an effort to determine the materiality of the interrogatories propounded to the insured, he propounded certain interrogatories to the insurance company. Interrogatory No. 5 is in the following language:
"Interrogatory No. 5 (a) State what evidence there was of an inflammable in the kitchen of the house located at 1840 Barrett Street, Jackson, Mississippi.
(b) State the name and address of the person or persons who discovered said inflammable and what means were used to discover said inflammable.
(c) State the name and address of the person or persons who placed the inflammable in the kitchen.
(d) State by what means the Defendant acquired the knowledge to answer 5. (c)."
The insurance company answered as follows:
"5. (a) Reported by one or more of the unidentified firemen who entered the premises during the fire of May 14, 1972.
(b) Unknown. See answer to 5(a) above.
(c) Undetermined.
(d) No answer required. See answer to 5(c) above."
*652 The answers were hearsay, evasive and inadmissible into evidence. Moreover, the insured had no way of knowing that the questions asked about arson were material, since there was no indication that the fire was caused by arson. He asked the insurance company why they were material, but the attorney for the insurance company refused to tell him at the time the interrogatories were propounded.
During the trial of the case the appellant tried to go into the questions and answers given at the insurer's examination so as to explain his answers, but the trial judge would not permit the insured to give any testimony as to the interrogatories and none was offered by the insurance company. There was no evidence offered as to whether or not they were material to the issues.
5A J. Appleman, Insurance Law and Practice § 3552, at 564-565 (1970), has this to say on this subject:
"The refusal of the insured to answer to an immaterial matter, or inability to give certain information desired, would not preclude recovery. And where the mistake was made by the insured because the company had withheld his books of account from him, the error will be subject to correction on the trial." (Footnotes omitted).
The insurance contract beginning with line 157 has this to say:
"No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss."
This paragraph simply means that any suit brought before the interrogatories are answered is prematurely brought.
14 G. Couch, Cyclopedia of Insurance Law § 49:731, at 197-98 (2d ed. 1965), has this to say on the subject:
"There is authority that if the insurer sees fit to demand an examination under the terms of the policy, the submission of the insured to the examination is a condition precedent to his recovery. Moreover, such a condition must be complied with even though the insured is under indictment in respect of the loss, since the constitutional immunity from being a witness against oneself does not apply in such case.
According to some authority, however, submission by the insured to the examination is not a condition precedent to a recovery on the policy, unless the policy so provides either expressly or by clear implication. It has been held that a fire policy provision permitting examination of the insured under oath by any person named by the insurer, providing that the insured shall subscribe to the same, and providing that no action or suit on the policy was sustainable unless all requirements of policy had been complied with, did not make the signing of the transcript of examination of the insured a condition precedent to bringing action on policy, but merely delayed action until the transcript was signed." (Footnotes omitted).
In the case of George v. Connecticut Fire Insurance Co., 84 Okl. 172, 182, 201 P. 510, 512, 23 A.L.R. 80 (1921), the Oklahoma Supreme Court had the following to say on this point:
"The question for consideration is: Where a policy contains a provision requiring the insured to submit to an examination under oath, and contains a further provision that no suit shall be sustainable until the insured has complied with the terms of the policy, will the failure to answer material questions forfeit the policy? The general rule of law is that forfeitures are not looked upon with favor by the courts. The policy does not provide that a failure to answer a material question shall forfeit the policy, but provides no suit shall be sustainable *653 until the provisions of the policy are complied with. The word `sustain' may be susceptible of several constructions. Webster defines `sustain' to mean to `carry on,' or to `maintain,' and that is the general meaning of the term."
The Oklahoma court further said in the George case by quoting from Porter v. Traders' Insurance Co., 164 N.Y. 504, 58 N.E. 641, 52 L.R.A. 424 (1900):
"The provision of the contract as to which a breach is alleged is the agreement of the insured to `submit to examinations under oath by the person named by this company.' They did submit to examination. It cannot be claimed that they were bound to answer every question propounded, however irrelevant. They were bound to answer only such as were material, having in view the purpose of the condition. They had no guide as to what was or was not material, except their own judgment, acting, of course, in good faith. Even if they made a mistake in deciding that the inquiry with respect to the cost of the steamer was not material, it is no ground for visiting them with a forfeiture of all the benefits of the contract, and the principle above suggested should apply." 84 Okl. at 182-183, 201 P., at 513, 23 A.L.R. at 96.
The Court then stated:
"Under our practice it would be more appropriate to raise this defense by a motion to dismiss, and if the controversy arose over whether certain questions were material, if the court should decide the questions were material, the court should make an order requiring the insured within a certain time to answer such questions, and upon failure to answer said question, the court should dismiss the case, or if during the trial of the case the court should decide that the questions were material, the case should be continued and the insured given an opportunity to answer said questions before dismissing the case.
The courts have been very liberal in construing this provision of the policy and have never placed a technical construction upon the same. [Cases cited]. To hold a refusal to answer questions which the insured and his attorneys in good faith believed were immaterial would work a forfeiture of the policy, without first giving the insured a right to comply with the same if he was honestly mistaken, would be placing a too narrow and technical construction upon the provisions of the policy. The case should be dismissed only after the court determines the questions in controversy are material, and the insured then refuses to comply with the orders of the court to answer said questions. This court in the former opinion should have ordered the case reversed, with directions to require the insured to answer those questions that were material, and upon his failure to do so then and not until then should the trial court dismiss the case in so far as it related to the insurance upon property covered by the mortgages, but in no event should the case have been dismissed in so far as it relates to the insurance upon the household furniture." 84 Okl. at 182-183, 201 P. at 513, 23 A.L.R. at 96-97.
In the case of Humphrey v. National Fire Insurance Co., 231 S.W. 750 (Tex. Com.App. 1921), where the policy does not expressly permit a forfeiture, the exact provision that no suit may be maintained until all the requirements of the policy have been met was interpreted to mean that the case could not be maintained until the questions were answered. The policy in Humphrey contained the exact paragraph set out in the instant policy in the lines following line 157 above mentioned.
In the case of North British & Mercantile Insurance Co. v. Rose, 228 F. 290 (3d Cir.1916), Headnote No. 3 is in the following language:
"Pursuant to a provision of a fire insurance policy that insured as often as *654 required should submit to examination under oath by any person named by the company, insured submitted himself to examination and produced a deed purporting to complete his title to the mortgaged premises. The insurance company's representative raised a doubt as to its genuineness and demanded that the writing be submitted to a handwriting expert. Insured declined to be further examined without counsel. Subsequently, on December 7th, there was a further conference between the insured, his attorney, and the insurance company's representative, at which insured refused to submit the deed to inspection or to submit himself to further examination, but on February 18th he wrote the insurance company submitting himself and his papers to examination, and his offer was rejected by the insurance company. Held, that insured's first refusal to submit himself to further examination was not as a matter of law a complete and final refusal to comply with the provisions of the policy constituting a failure to perform the conditions precedent to a right of action, notwithstanding his subsequent offer to submit himself to examination." 228 F. at 290.
The issue as to whether or not the insured "wilfully concealed or misrepresented any material fact" is a question for the trial court on proof offered and at that time one may explain his refusal to answer on the ground that the question is not material or that he did not wilfully conceal or misrepresent any fact.
In the case of Mulkey v. United States Fidelity & Guaranty Co., 243 S.C. 121, 132 S.E.2d 278 (1963), the Court said: "In order to avoid a policy for false swearing in the proof of loss, the false statements must be of a material fact and intentionally and willfully made with the intent to deceive and defraud the insurer." 243 S.C. at 126, 132 S.E.2d at 281.
In Porter v. Traders' Insurance Co., 164 N.Y. 504, 58 N.E. 641, 52 L.R.A. 424 (1900), the court held:
"A marine policy, which provided that the insurer should not be liable for more than the value of the property at the time of loss, required the insured to submit to an examination under oath, in case of loss, and provided that no suit could be maintained on the policy unless the insured complied with all the requirements thereof. The steamer, which was insured for $2,500, was old, and had been purchased by insured at a receiver's sale, and $3,500 was afterwards expended in repairs. On an examination after the loss, the insured refused to state the price they paid therefor. The insurer introduced no evidence showing that the price paid was material. Held, that such refusal would not prevent a recovery on the policy, since it could not be said as a matter of law that the price paid was material to the risk." 58 N.E. 641, Headnote No. 3.
In Insurance Companies v. Weides, 81 U.S. (14 Wall.) 375, 20 L.Ed. 894 (1872), the Court held: "Where the policies stipulated that fraud or false swearing on the part of the assured should work forfeiture of all claim under them, statements in the proofs of loss honestly made, although subsequently discovered to be mistaken, will not work a forfeiture." 20 L.Ed. at 894, Headnote No. 5.
In Merchants Insurance Co. v. Lilgeomont, Inc., 84 F.2d 685 (5th Cir.1936), where the forfeiture clause was the same as in the instant case, the Court held:
"Insured corporation's president, repairing her refusals to answer questions on examination by insurer to extent of her ability when testifying in preliminary trial on pleas in abatement of actions on fire policies, held properly permitted to explain that she refused to answer because she did not know or remember facts inquired about or believed them immaterial." 84 F.2d at 685, Headnote No. 4.
It is a general rule of law of universal acceptance that forfeitures are not favored by the law.
*655 The text writer of 12 Am.Jur. Contracts § 436, at 1016-17 (1938), has the following to say on this subject:
"Forfeitures are not favored by the law; indeed, they are regarded with disfavor. It is well settled that forfeitures by implication or by construction, not compelled by express requirements, are regarded with disfavor. Contracts involving a forfeiture cannot be extended beyond the strict and literal meaning of the words used. Since forfeitures are not favored either in equity or in law, provisions for forfeitures are to receive, where the intent is doubtful, a strict construction against those for whose benefit they are introduced. Courts are reluctant to declare and enforce a forfeiture if by reasonable interpretation it can be avoided. Forfeitures are enforced only where there is clearest evidence that that was what was meant by the stipulation of the parties. There must be no cast of management or trickery to entrap a party into a forfeiture. Nothing but the clearest expression of such a design justifies the assumption that an executed contract was intended by either party as a snare. If technical forfeitures could be sustained by such intendments, the effect would be to weaken private confidence in commercial faith and occasion justifiable solicitude as to the security of important rights. Where the clause of a contract providing for a forfeiture can be construed either as authorizing the destruction of all rights which have become vested under it or as authorizing the annulment of only such parts of the contract as have remained executory, the court will adopt the latter construction. Before forfeiture can occur, it must be clear that the parties intended to provide for it in the contract under which it is attempted to enforce it; and where the contract is revocable at the pleasure of either party, without condition expressed, a penalty of forfeiture cannot be enforced against either making the revocation." (Footnotes omitted).
In Kyser v. Southern Building & Loan Ass'n, 224 Ala. 673, 141 So. 648 (1932), it was held:
"Generally, innocent party electing rescission must place other party in statu quo.
Such innocent party generally must, with his election to rescind, place the other party in statu quo by returning, or at least offering to return, whatever of value he has received under the contract." 224 Ala. at 673, 141 So. at 648, Headnote No. 2.
In Protective Life Insurance Co. v. Thomas, 223 Ala. 106, 134 So. 488 (1931), it was said:
"Forfeitures are looked upon by the courts with disfavor, and it is a rule of general application that stipulations in contracts intended to work a forfeiture of a conceded right will not only be strictly construed, but strict compliance therewith by the party claiming the forfeiture will be exacted." 223 Ala. at 108, 134 So. at 489.
In Caledonian Insurance Co. v. Indiana Reduction Co., 64 Ind. App. 566, 115 N.E. 596 (1917), the court stated:
"The doctrine is well established by the decisions of both courts of appeal of this state that a provision in an insurance policy that the policy should be void if any of the conditions (such as the use of gasoline here) were broken, simply means that the policy is voidable at the option of the insurer, and if appellant desired to rescind the contract because of the use of gasoline in violation of the provisions of the policy, it was required to act promptly and inform the insured of its election to avoid the policy, and in some manner return, or offer to return, all of the unearned premium; and a failure *656 on the part of the insurer so to do will be deemed a waiver on its part to declare the policy void and it will be held to have determined to treat the policy as a valid existing contract of insurance." 64 Ind. App. at 568, 115 N.E. at 596.
In Johnson v. Life Insurance Co. of Georgia, 52 So.2d 813 (Fla. 1951), the Florida Supreme Court said:
"At the outset, we mention the familiar and oft-quoted rule that a forfeiture of rights under an insurance policy is not favored by the law, especially where, as here, a forfeiture is sought after the happening of the event giving rise to the insurer's liability. And it is equally well settled in insurance law that, when an insurer has knowledge of the existence of facts justifying a forfeiture of the policy, any unequivocal act which recognizes the continued existence of the policy or which is wholly inconsistent with a forfeiture, will constitute a waiver thereof." 52 So.2d at 815.
There is still another compelling reason why the judgment in the instant case should be reversed.
It has for time immemorial been a rule of law that before any contract can be rescinded the party offering to rescind must place the opposite party in status quo. See 12 Am.Jur. Contracts § 451, at 1031 (1938).
In the instant case, however, the insurance company is not offering to rescind the contract, but on the contrary, it invokes a paragraph in the contract whereby the contract declares itself to be void if the insured refuses to answer material questions about the ownership of the property. It claimed that the insured never owned but a one-half (1/2) interest in the property, and that the policy from the beginning only covered his one-half (1/2) interest. It did not tender back the premiums collected for the half never insured. It had no right to declare a forfeiture of the policy, and at the same time, retain premiums it says it was never entitled to receive.
It has been held generally that "[a]n insurer seeking to forfeit a policy has been required to make a prompt tender to the insured of unearned premiums." 6A J. Appleman, Insurance Law and Practice § 4149, at 458 (1972). See cases collected under Note 47, at 458.
I am of the opinion that this case should be reversed and remanded to the trial court so that the appellant may be given a fair chance to explain his answers given at the examination conducted by the insurance company. If found to be material from the evidence offered, the court may permit him to answer the questions. The chancellor may then continue the case so as to give the insurance company a fair opportunity to examine the answers to determine whether or not there has been any fraudulent concealment of facts or circumstances. The court may then determine from the proof offered whether or not there was any fraudulent concealment of the ownership of the property; and, if so, whether to all or only half of the owned title. It seems to me that, in any case, not more than one-half (1/2) of the policy should be forfeited, otherwise, the insurance company is given a license to entrap an insured.
INZER, SUGG and WALKER, JJ., join in this dissent.