**Jim CLARK, Plaintiff-Appellant,**

v.

**AETNA CASUALTY & SURETY COMPANY, Defendant-Appellee.**

No. 85–4183
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Dec. 13, 1985.

---

Before POLITZ, GARWOOD, and E. GRADY JOLLY, Circuit Judges.

## OPINION

GARWOOD, Circuit Judge:

In this Mississippi diversity case, appellant-plaintiff Jim Clark appeals the district court's judgment, 607 F.Supp. 63, following a bench trial, that Clark recover nothing from appellee-defendant Aetna Casualty & Surety Company on its insurance policy issued to Clark, because he had made material misrepresentations to Aetna during its investigation subsequent to the fire that destroyed Clark's insured farm equipment. Clark claims the district court erred in finding that (1) he had made such misrepresentations, and (2) his insurance policy with Aetna was not "valued." Clark also asserts that the policy is divisible, a matter the district court did not rule on as it was not raised below. We affirm.

### Facts and Proceedings Below

On June 22, 1981, Aetna issued a fire insurance policy to Clark covering seventeen specified pieces of farm equipment. The declarations page of the insurance policy lists these items separately, and then declares the total insured amount to be $38,470. As reflected by the policy, the premium charged was eighty cents per one hundred dollars or, here, $308, which Clark duly paid. The "Basic Policy Provisions" provided that if an insured event occurred, recovery would be limited to the lesser of the cash value of the equipment at the time of the event or the separate "Amount of Insurance" listed for each item on the declarations page of the policy, such amounts totaling $38,470.

On August 22, 1981, exactly two months after Clark procured this insurance, all the insured equipment was destroyed in a fire. At the time of the fire, all seventeen insured items were bunched together under the same open shed. Clark reported the

Smith, Ross and Trapp, Orma R. Smith, Jr., Corinth, Miss., Laurel G. Weir, Philadelphia, Miss., for plaintiff-appellant.

Watkins & Eager, Richard T. Lawrence, Jackson, Miss., for defendant-appellee.

loss to Aetna the following day. On August 25, Aetna sent Roger Riddick, a claims representative, to investigate the fire. Clark did not give a statement to Riddick on the day of Riddick's arrival, however, because one of Clark's children was visiting him.

A telephone interview of Clark by Riddick was subsequently conducted on August 27, 1981, during which Clark maintained that he could not find any of his records of the burned equipment. He did not, however, ask Riddick to stop the interview. Riddick posed various questions to Clark about his acquisition of the equipment, and Clark replied that he could not recall from whom he had purchased the equipment. For instance, when Riddick asked Clark when he had acquired a particular trailer, Clark vaguely asserted that he had purchased it from a resident of Arkansas whose name he could not recall. In that same vein, when asked whether he had obtained an appraisal for his original valuation of the equipment for the insurance policy, i.e., $38,000, Clark stated that he had indeed received an appraisal from an employee of the Mooney Tractor Company, but that, again, he could not now recall that person's name or find the original appraisal.

After this interview, Clark was told by Riddick that he needed a bill of sale for each item of the destroyed equipment before Clark would be reimbursed. Clark subsequently produced the needed bills of sale, most of them from family members and friends. Thus, Clark maintained that he obtained a single axle trailer from his stepfather, despite having previously stated that he could not remember the name of the person in Arkansas who sold him this equipment. Clark further said that he bought a Massey-Ferguson tractor, also insured, from Okla Bozeman for $7,900. However, Bozeman later stated that the total consideration for this tractor was $3,000. Clark claimed that this difference lay in repairs he made to the tractor. Additionally, Clark, despite having earlier said that he could not remember from whom he had purchased various hay cutting and baling equipment, produced a bill of sale for this equipment from Ovett Gipson for $16,000. This bill was dated May 12, 1981, just three months before the fire. However, the numeral "1" in the $16,000 figure is in blue ink, while the "6,000" is in black ink. At trial, Clark explained that he paid Gipson $10,000 in cash and signed a note for $6,000, but denied having marked on the bill of sale. Another bill of sale purportedly shows that Clark purchased various items of farm equipment from Billy Irons, his next door neighbor.

Continuing his investigation, Riddick conversed with a representative of Mooney Tractor Company, the company that Clark said had prepared the original valuation for his insurance policy. The Mooney representative stated that Clark's first request for an appraisal came after the fire. Clark now claims the Mooney employee that he had used for the appraisal is working offshore. Riddick did procure a new estimate from this representative, based on a current description of the equipment, that estimated the cash value of the destroyed equipment to be approximately $16,000. Riddick also contacted the Pedigo Equipment Company to obtain values of the insured equipment from the official guide to tractor and farm equipment, and Pedigo came up with an estimate of approximately $17,000. Clark, however, told Riddick that he had had the equipment appraised at Saxon Motor Supply for over $28,000 and offered to settle for that amount. Subsequent investigation revealed, however, that Mark Saxon of Saxon Motor Supply had based the $28,000 estimate on the values of both new and used replacement equipment, depending on availability. Saxon's estimate of the immediate cash value for Clark's equipment was $20,000. Riddick offered to settle for this amount, but was rebuffed by Clark, who counteroffered for $26,000.

On December 11, 1981, Aetna, in a letter to Clark, elected to invoke its right under the policy to take Clark's sworn statement. Clark gave this statement on December 29, 1981, and revealed that he had secured the

needed bills of sale following the fire, which, he asserted, had destroyed the originals, along with most of his other records. One record that did survive the fire was the original of his insurance policy, which Clark did not keep in the shed. During his sworn statement, Clark stated that his income tax for 1981 would show profits of approximately $5,000 to $6,000 from selling cattle, $3,500 to $3,800 from hauling hay, and $4,000 to $5,000 from hauling pulp wood. Clark's federal tax return for that year, however, reflects no income from hauling hay or pulp wood, and shows a substantial loss in cattle farming operations.

After both Clark's statement and Aetna's offer to settle, a deputy fire marshal informed Aetna that the bill of sale submitted by Billy Irons was not an original and that Irons had in fact not sold any equipment to Clark. When Riddick questioned Clark about this bill of sale, Clark maintained that it was legitimate. Further investigation by Aetna revealed that the bill of sale signed by Okla Bozeman was also inaccurate, for the stated price exceeded the actual sales price by $5,000. Consequently, Aetna considered the policy void and refused to pay. Clark then brought this suit to enforce his policy rights.

Following a bench trial, the district court held that Aetna need not pay Clark under the policy because Clark had made material misrepresentations to Aetna during the course of its investigation following the fire. Clark appeals, claiming three errors: (1) that any misrepresentations made were not material or knowing and could not have been relied on by Aetna; (2) that the policy is a "valued policy" and thus any misrepresentations made thereunder are irrelevant since Aetna is bound to pay a stated contract value; and (3) that the policy is divisi-

ble and thus a misrepresentation as to one part does not thereby serve to void the whole.

## Discussion

*Misrepresentations*

Clark claims that the district court's finding that he made material misrepresentations to Aetna during its investigation are clearly erroneous. Clark does not now contend that the information he gave to Aetna was entirely accurate, but instead maintains that any inaccuracies were either innocent or immaterial. Clark thus concludes that the clause in his policy providing that a misrepresentation of a material matter voids the policy should not have been triggered.[1]

Mississippi law, which concededly governs in this diversity case, demands that the insured help an insurance company investigate the cause of an accident or fire. *See Edmiston v. Schellenger*, 343 So.2d 465, 466–67 (Miss.1977). To this end, the Mississippi Supreme Court has noted that "[i]t is well established that such [concealment] clauses in fire insurance policies are reasonable and valid, and are to be given a reasonable interpretation." *Taylor v. Firemen's Fund Insurance Co.*, 306 So.2d 638, 644 (Miss.1975) (quoting *Southern Guaranty Insurance Co. v. Dean*, 252 Miss. 69, 172 So.2d 553 (1965)). In Mississippi, for an insurance company to defeat a policy on the basis of a "concealment" clause, it must establish that statements by the insured were (1) false *and* (2) material *and* (3) knowingly and wilfully made. *Watkins v. Continental Insurance Companies*, 690 F.2d 449 (5th Cir.1982). As the evidence clearly shows, and Clark does not really dispute, that misrepresentations were

1. Clark's policy with Aetna provides:
   "This entire policy shall be void if, whether before or after a loss, the Insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or in case of any fraud or false swearing by the Insured relating thereto."

As we have noted, these clauses in Mississippi (whose law is concededly applicable here) "are far from new." *Watkins v. Continental Insurance Companies*, 690 F.2d 449, 451 n. 2 (5th Cir.1982).

made, our inquiry proceeds to the second and third requirements.[2]

Mississippi courts take a "broad view of materiality," *Edmiston, supra,* at 446, as applied to misrepresentations made during an insurance investigation. Since concealment clauses are meant " 'to enable the Company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims,' " *id.* at 466–69 (quoting *Claflin v. Commonwealth Insurance Co.,* 110 U.S. 81, 3 S.Ct. 507, 515, 28 L.Ed. 76 (1883)), the Mississippi courts are particularly willing to enforce them to ensure viable investigations. Furthermore, the Mississippi Supreme Court has held that under these clauses any misstatements or concealments are to be judged material at the time made and not on the basis of whether a particular defense, such as arson, is later actually asserted, for an insurance company must properly protect itself against false claims. *Id.* at 467.

Mississippi courts have held a wide range of information material under concealment clauses. *See, e.g., id.* at 464 (false answers as to the insured's location at the time of the fire held material); *Taylor, supra,* at 644–45 (refusing to give answers to an insurance company investigator following a fire held material); *Southern Guaranty, supra,* at 554–56 (refusal to answer inquiries about financial matters held material). Our focus here is to determine whether the district court's findings, that certain specified misrepresentations were material and wilfully made, are clearly erroneous. These misrepresentations consist of Clark's misstatements about the origins of his equipment.[3]

■ We find, as did the Mississippi Supreme Court in *Standard Insurance Co. v. Anderson,* 227 Miss. 397, 86 So.2d 298, 301–02 (1956) (quoting *Claflin, supra,* 3 S.Ct. at 516), that "[b]y that contract the companies were entitled to know from him all the circumstances of his purchase of the property insured, including the amount of the price paid and in what manner payment was made; and false statements, wilfully made under oath, intended to conceal the truth on these points, constituted an attempted fraud by false swearing which was a breach of the conditions of the policy, and constituted a bar to the recovery of the insurance." Thus, statements about the previous owner of property and how much consideration was paid are clearly material in a cash value policy, for these policies, dependent on market values, are necessarily concerned with recent purchases as indicative of such value. Clearly, information reflecting on the insured's title to the equipment, the money paid for that equipment, or the source of the funds used to purchase that equipment, are material in an insurance dispute over personal, movable property. *See Taylor, supra,* at 644. These concerns affect the very core of the contract between the parties. The misstatements found by the court below concerned a bill of sale, later found to be false, for equipment supposedly bought from Billy Irons. We agree that the misrepresentations made about this bill of sale are material and thus conclude that the district court's findings are not clearly erroneous.

The third and last requisite under Mississippi law before Aetna can void its obligation to Clark is a finding that Clark's

2. In his initial talks with Riddick, Clark maintained that all his previous statements were true, as were the bills of sale. After it was discovered by the fire marshal that Billy Irons' bill of sale was not original, Clark claimed that all his records were destroyed in the fire, that Aetna knew this, and that therefore some of the bills of sale for the insured equipment were in error. In particular, Clark singled out the bill of sale from Billy Irons as inaccurate.

3. The court below specifically found the misrepresentations by Clark about the purchase of two items of equipment from Billy Irons to be *both* material *and* wilfully made. Even though the district court also found that Clark made material misrepresentations about his financial status to Aetna, it did not, in its subsequent analysis, expressly find this misstatement wilful, although perhaps such a finding is inferable.

misrepresentations were knowingly and wilfully made. *See Edmiston, supra,* at 467. If "[o]ne cannot escape the conviction that the false statements ... [are] knowingly and wilfully made, ... the intent to deceive will be implied." *Claxton v. Fidelity & Guaranty Fire Corp.,* 179 Miss. 556, 175 So. 210 (1937). *See Edmiston, supra,* at 467. In *Claxton,* the insured claimed that fire had destroyed a five-year-old piano valued at $500. The court, however, determined that the insured had owned the piano for twenty years and that it was only worth $50, and thus concluded that the insured's statements were knowingly and wilfully made. In *Edmiston, supra,* at 467, the intent to deceive was found by the insured's admission that the statements he had earlier made to the insurance company were false. Here, Clark admits that the bill of sale given to him by Billy Irons was false, despite his earlier intimations to the contrary. This admission came during his cross examination. Clark claims, however, that since the insurance company knew the originals had been destroyed in the fire, they consequently knew he did not possess the originals for the insured equipment. Thus, he claims, the insurance company, in effect, not only knew of the misrepresentations, but by their actions forced him to falsify these records. We find this argument unpersuasive because this bill was not a "duplicate" bill of sale from the original seller but, as Clark admitted, a completely false one. We additionally note that in Mississippi the continued concealment of a misstatement of material misrepresentation can void a policy if, as here, the policy so provides. *See Standard Insurance Co. v. Anderson,* 227 Miss. 397, 86 So.2d 298 (1956). Here, Clark did not attempt to rectify the Billy Irons misstatement until trial. The district court's findings that Clark's misrepresentation was wilful and material is not clearly erroneous. Accordingly, the court below correctly concluded that the policy was voided under its misrepresentation clause (see note 1, *supra* ).

## Valued Policies

Clark's second contention is that even if he did make misrepresentations to Aetna, these are rendered irrelevant because his policy with Aetna is "valued." While we doubt that the misrepresentations were immaterial even to a valued policy, *see* J. Appleman & J. Appleman, *Insurance Law and Practice* § 3828 (1972) (stating fraud or misrepresentation may vitiate the stated values in a valued policy), we in any event are unable to conclude that the district court erred in determining that the policy was not valued.

In a valued policy, the value of the property insured is *agreed* upon by the parties. If a total loss of the insured property occurs, then the insurance company pays the stipulated value; the actual value is irrelevant. *See* Appleman, *supra,* at 3827. It is the "uncertainty of the amount which distinguishes an open from a valued policy." *Id.; see American Insurance Co. v. Gentile Brothers Co.,* 109 F.2d 732, 734–35 (5th Cir.1940) (interpreting Kentucky valued policy law). It is this desire to precisely fix the risks that differentiates a valued policy from other insurance contracts. This has been analogized to a "liquidated damages clause." *See Gerhard v. Boston Insurance Co.,* 99 F.Supp. 247, 250 (E.D.Pa. 1951).

Clark claims that his policy with Aetna is valued because it states the value of his equipment. Moreover, Clark asserts that since "the insurer is obligated to pay the amount of the policy [under a valued policy], it follows that no proof of the amount of loss is required...." *Couch on Insurance 2d* (rev'd ed.) § 54:106, (esp. fn. 10). Since no proof of loss is necessary, Clark contends that consequently any misrepresentations as to the value of his equipment after the fire are not material.

Valued policies are created in many states by statute, usually covering the total loss of real estate properties. *See, e.g., Couch on Insurance 2d, supra,* at § 54:111; 6 Appleman, *supra,* §§ 3829–3850 (discussing valued policy statutes on a state-by-state basis). Mississippi has such

a valued policy statute, Miss.Code Ann. § 85–13–5 (1972), which "must be read into any policy subsequently issued" and "renders nugatory" contrary provisions in the insurance contract. 6 Appleman, *supra*, at § 3839 (footnote omitted). Although this statute is not applicable to personal property, such as farm equipment, *Home Insurance Co. v. Greene*, 229 So.2d 576 (Miss.1969), "[t]he fact that the statute does not provide for a particular policy does not mean that the parties cannot write a valued policy although the contract is not within the scope of the statute." *Couch on Insurance 2d, supra*, at § 54:111. *See also Huth v. General Accidental and Life Insurance Corporation, Ltd.*, 536 S.W.2d 177 (Mo.Ct.App.1976) (holding that the creation of valued policies by contract is valid). Indeed, this Court has stated, "In a valued policy the value of the subject matter is agreed upon beforehand. If there is anything in the policy which clearly indicates an intention on the part of the insured to value the risk and loss, in whatever words expressed, the policy is valued." *Gentile Brothers, supra*, at 735 (applying Florida law).

Since Aetna's policy is not required to fall within the Mississippi valued policy statute to be considered valued, the question must be determined from examination of the policy "in its entirety." *See* Appleman, *supra*, at § 3827. The policy's declarations page contains an "amount of insurance" column that specifically lists a dollar figure for each item of equipment, at the foot of which there is a figure equaling the total of these amounts, stated to be the "Total Amt. of Ins." Considered by itself, this feature is indicative of a valued policy. On the other hand, the policy has a specific and express cash value provision.[4] Clark urges that the "amount of insurance" language on the declarations page of the policy clearly shows an intent to form a valued contract. *See Huth, supra*, at 181; *Gerhard, supra*, at 247. Both these cases held that "amount of insurance" or "insured value" language could be equated to the typical valued policy formulation such as "valued at," and that such language is not equivalent to the "maximum value" terminology found in open policies. Moreover, Clark argues, the fact that the premiums in the Aetna policy are based on a percentage of the stated values is also indicative of a valued policy. *Huth, supra*, at 181; *Ball v. Aetna Casualty & Surety Co.*, 58 F.R.D. 362, 364 (E.D.Ky.1973); *Gentile Brothers, supra*, at 735–36.

Although the above factors, considered apart from other policy provisions, may be inferentially indicative of a valued policy, they "are not conclusive in the absence of unambiguous policy terms reflecting a 'valued' policy." *Ball, supra*, at 364. Here, the inclusion of the cash value provision establishes that the policy is not valued. *See* Appleman, *supra*, at § 3824 (discussing typical insurance policies on machinery and equipment), § 3826 (discussing the standard policies for goods and merchandise). It is obvious to us that the "amount of insurance" merely sets the premium and puts a maximum on recovery, while the cash value provision expressly and specifically sets the measure and limit of recovery within these stated policy amounts. This measure and limit is clearly stated in the policy. We further note that the "amount of insurance" provision and the cash value clause do not conflict.[5] Since there is no

---

4. Clark's policy with Aetna provides, under "Basic Policy Provisions":

"The Company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs and the loss or damage shall be ascertained or estimated according to such actual cash value with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost to repair or replace the same with material of like kind and quality."

5. In the *Huth* case, on which Clark relies heavily, the Missouri Court of Appeals held that there was a conflict between the basic policy, which carried the cash value provision, and an attachment. *Hutch, supra*, at 181. The court in *Huth* then ruled, "The provision of the attachment *deletes* any reference to actual cash value referred to in the basic policy and indicates to us that the company has agreed to pay the full amount of the insured value of the guns or the replacement cost whichever is less." *Id.* (emphasis added). As the court below noted,

conflict, the cash value provision survives and expressly limits recovery to actual cash value at the time of loss with proper deduction for depreciation. This is inconsistent with the initially fixed value recovery which is essential to a valued policy. Indeed, we can see no circumstance in which, on the same type of recovery (here a total loss), a cash value recovery provision can be found within a valued policy contract; "valued policy" and "cash value" recovery are necessarily mutually exclusive. *See Springfield Crusher, Inc. v. Transcontinental Insurance Co.*, 372 F.2d 125 (3d Cir.1967) (holding that a requirement of proof of actual cash value renders a policy open); *cf. Huth, supra,* at 181 (deleting a cash value provision before finding a value policy).

We reject appellant's valued policy argument.

*Divisibility*

■ Clark's last argument is that even if the policy was not valued and a misrepresentation was wilfully made, the policy is divisible and this allows him to recover for those insured items as to which no finding of misrepresentation was made. We do not decide this issue, however, because it is not properly before us. When before the district court, Clark made no mention of this claim in his pleadings, in discovery material, in the pretrial order, in any pretrial or trial motion, or in any requested findings or conclusions. Moreover, Clark did not file any motion to alter or amend the district court's judgment or for a new trial.

Ordinarily, an issue not presented to or passed on by the district court will not be considered by this Court on appeal. *See, e.g., Stanley Educational Methods v.*

Clark's policy has no such attachment; thus the policy in *Huth* and the one here are distinguishable.

**6.** During the cross-examination of Riddick by Mr. Smith, Clark's attorney, the following exchange occurred:
"Q. Mr. Riddick, do you know what is referred to as a divisible policy?
"A. I believe, but I'm not sure.
. . . .
"[Mr. Lawrence, Aetna's counsel, objected to this questioning.] Your Honor, we object. I

*Becker C.P.A. Review,* 539 F.2d 393, 394 (5th Cir.1976); *Alabama Great Southern R.R. Co. v. Allied Chemical Corp.*, 501 F.2d 94, 103 (5th Cir.1974); *D.H. Overmeyer Co. v. Loflin,* 440 F.2d 1213, 1215 (5th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). In an exceptional case, we may depart from this rule when a pure question of law is involved which if not ruled upon will lead to a miscarriage of justice. *See, e.g., Evans v. Triple R Welding & Oil Field Maintenance Corp.*, 472 F.2d 713 (5th Cir.1973). Here the general rule must govern because the issue was not raised below, and Clark has neither presented any reason for his failure to raise this issue below nor shown any unique harm such as to make the result manifestly unfair if he were not allowed to present this issue to us. Further, the issue is not really a pure question of law, for further findings would be required as to possible misrepresentations relevant to other (or all) items, and as to the actual cash value of any items not affected by misrepresentation. The case was not tried or the findings of fact or conclusions of law made on the theory that the policy was other than unitary. It would be manifestly unfair and unrealistic to assume that appellee would have put on no further evidence, or that the court below would not have made further findings, if there had been an issue as to whether the policy was divisible. We decline to in effect grant appellant a new trial based on such a theory raised for the first time on appeal.

Clark argues that the divisible policy issue was raised at trial and disallowed only as to punitive damages.[6] We observe that

think he's trying to come up with a new theory of punitive damages that were not answered to in interrogatories or set forth as a contested issue of fact or law in the Pretrial Order, and we object to this eleventh-hour attempt to come up with some new basis for a punitive damages claim by saying they're divisible between each of the 17 items and that we should have paid one or two of them. "THE COURT: What do you say to the— "MR. SMITH: I say that it's covered in the Pretrial Order. The issue is whether or not

Aetna's objection at trial to a question about divisible policies (see note 6, *supra*) was lodged because Aetna was *surprised* by this line of questioning. The record here shows that Clark did halfheartedly try to raise this issue during trial cross-examination, but that he *withdrew* the questions in their entirety after successive objections by Aetna. Thus, to the extent the divisibility question was raised below, Clark subsequently waived the issue. Clark's assertion that only the punitive damages aspect of this issue was resolved is disingenuous because he waived this entire line of questioning, and this questioning constituted the only time that the question of the policy's divisibility was broached in the court below. Therefore, the issue is not properly before us.

Having rejected each of Clark's contentions, we affirm the judgment of the district court.

AFFIRMED.

they wrongfully and maliciously withheld payment. Whether it's payment in toto or for the divisible parts is an issue that's before the court.
"THE COURT: The objection is overruled.
"MR. LAWRENCE: Your Honor, may I respond to that?
"THE COURT: Yes, sir.
"MR. LAWRENCE: We set forth in interrogatories to opposing counsel to state specifically in detail what the basis for the punitive damages claim was, and this was not disclosed in there. This is something they've come up with, and you can look at the Proposed Findings of Fact and Conclusions of Law and see that this is something they've come up with at the eleventh hour, and it's not an issue of fact set forth in the Pretrial Order, and it's not a contested issue of fact either."
After a discussion of the interrogatories in which it appeared that Clark did *not* raise this issue earlier, the following occurred:
"MR. SMITH: That's the law; and there's no issue, that that being the law, that a policy such as this is divisible. Now, I may not have said that a theory of collecting punitive damages is that they didn't pay the items on which there was no disagreement. *If that's true, then I will withdraw the question.*
"THE COURT: All right, sir. *You withdraw the question?*

"MR. SMITH: *I will withdraw the question.* Then, after Mr. Smith attempted to question Riddick in a different manner about the same subject, the following occurred:
"MR. LAWRENCE: Your Honor, this was the same objection that I made previously, and he's trying to go over the same thing in a different way, to which we object on the grounds that it was not disclosed in answers to interrogatories as this being a theory of punitive damages.
"MR. SMITH: Only to show what he meant by his original offer of 21,480.
. . . .
"MR. LAWRENCE: Your Honor, if I may say this: that at this point if there is no theory that the contract was divisible as far as punitive damages, I'll be quiet; that they cannot come forth at this point and put on a theory of punitive damages . saying the contract is divisible.
"THE COURT: He withdrew the question a moment ago, *and the Court construes the situation that that theory is not put forth by the plaintiff.*
"MR. SMITH: Your Honor, I would reserve the right to look at my supplemental answers, *but I don't think it's a big issue, and I'd rather move on.*" (Emphasis added.)
These are the only occasions on which the matter was ever brought up.