NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,
Plaintiff,

v.

Harold DUNGAN and Bobbie Dungan;
United States of America, Farmers
Home Administration, Defendants.

Civ. A. No. J84–0844(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

April 4, 1986.

James L. Carroll, Watkins & Eager, Jackson, Miss., for plaintiff.

John Arthur Eaves, Eaves & Eaves, Pshon Barrett, Asst. U.S. Atty., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

TOM S. LEE, District Judge.

This cause came before the court for trial and the court heard testimony from witnesses and reviewed exhibits admitted in evidence. Plaintiff Nationwide Mutual Fire Insurance Company (Nationwide) filed this action pursuant to 28 U.S.C. §§ 2201 and 2202 seeking a declaratory judgment on the issue of its liability on a homeowner's insurance policy issued by it to defendants, Harold and Bobbie Dungan, plus further necessary or proper relief. The Dungans counterclaimed alleging breach of contract and bad faith refusal by Nationwide to pay benefits under the homeowner's policy, entitling them to an award of punitive damages. The United States, on behalf of Farmer's Home Administration. (FmHA), intervened and seeks a declaratory judgment that it is entitled to recover the proceeds of the policy by virtue of its priority lien on the Dungans' home notwithstanding any defenses Nationwide may be able to assert against the Dungans. Upon a review of the evidence adduced at the bench trial, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

Harold Dungan is a Mississippi resident who has been in the business of farming for the past twenty-five years. In addition to his farming operations, Dungan also owns a small trucking line and has been

employed by the United States government as a part-time federal crop insurance adjuster. For many years preceding the fire loss at issue in this suit, Dungan had maintained his residence at Pattison in Jefferson County, Mississippi. In 1974, Dungan constructed a palatial country home near Pattison, and it was for this home that he sought insurance coverage from Nationwide in 1982.

On or about January 6, 1982, Dungan called June H. Farrar, a Nationwide agent, at her office in Jackson, Mississippi to inquire about obtaining insurance coverage for his home. Dungan had been referred to Nationwide and Farrar by a neighbor who was a Nationwide insured. Shortly thereafter, Farrar and her district sales manager, Robert Whitlatch, drove to Dungan's home for the purpose of taking his application for insurance and to evaluate the risk involved in providing coverage.[1] Following a cursory view of the premises, Farrar and Dungan returned to the den of the house to fill out the application form. The court concludes from the testimony that others present when Farrar took Dungan's application were Robert Whitlatch and, intermittently, Mrs. Dungan, who testified that she was in and out of the den area while the application was being taken. Because it was normal practice in the application process and because Dungan's eyeglasses were being repaired and no others were available to him, Farrar repeated the questions on the form verbatim and filled out the form in accordance with answers provided by Dungan. The specific questions read by Farrar and answered by Dungan, as taken from a carbon of the application form filled out that day and admitted in evidence, were as follows:

Question: Furnish full information, past losses, date, cause, item damaged or stolen, amount ($).

Answer: None.

Question: Any policy cancelled or non-renewed?

Answer: No.

Question: Have you or any member of your household been sued, filed bankruptcy or had repossessions or judgments within the last five years?

Answer: No.

Question: Name of mortgagee and address.

Answer: –0–.

Question: Mortgage balance.

Answer: –0–.

The coverage requested on the application was in the amounts of $100,000 on the structure, $50,000 on the contents and $20,000 for additional living expenses. The application was then signed by Mr. Dungan and witnessed by Farrar. The signature of the insured was located just below and presumably in accordance with a warranty appearing on the face of the application which stated, "I hereby declare that the facts stated in the above application are true and request the company to issue the insurance and any renewals thereof in reliance thereon." After the application was executed, Farrar wrote out a check to Nationwide in the name of "A-Bar-D Plantation, by Harold Dungan, Bobbie Dungan or Harold Dungan, Jr." in the amount of $428.00 representing premium payment for six months' coverage. The check was signed by Dungan and, as Farrar had authority to bind coverage upon receipt of premium, the coverage was in force and effect thereafter.

Early on July 19, 1984, the Dungans' house was completely destroyed by fire. At the time, Mr. Dungan was attending a crop insurance adjusters' seminar in Jackson, Mississippi, while his wife was visiting in Georgia. Nationwide received notice of the loss the same day and assigned the

---

**1.** The record in this case contains conflicting testimony regarding the precise date on which Dungan called Farrar to discuss coverage and the date on which Farrar and her supervisor, Robert Whitlatch, drove to Dungan's home to receive his application. While the application bears the date of January 7, 1982, it appears that it might have been taken some days after that and then backdated. Beyond the issue of credibility, the critical relevance of the backdating urged by Dungan's counsel is not apparent to the court, and the court will not undertake to determine the exact date on which the application was taken.

claim to Bill Stevenson, a large loss property specialist with Nationwide. Stevenson conferred with Dungan over the telephone and agreed to meet with him at a restaurant in Port Gibson, Mississippi on July 23. There, Stevenson secured Mr. Dungan's signature on a non-waiver agreement [2] and his permission to go onto the premises to investigate the cause of the fire. Stevenson proceeded from Port Gibson to the house site where he conducted a brief investigation of the premises, determining that there was a total fire loss. Stevenson later ordered a detailed investigation to determine the cause of the fire. The investigation did not indicate arson.

The next day, July 24, 1984, Stevenson met with the Dungans at a motel in Vicksburg, Mississippi for the purpose of taking a statement and disbursing claim materials to them. A transcript of the statement was admitted in evidence. It reads in pertinent part:

Question: OK. So roughly you netted, your net income in 1983 would be somewhere around $50,000. Is that right?

Answer: That's close.

Question: Did you file an income tax return for 1983?

Answer: Yes, and I showed a loss.

\* \* \* \* \* \*

Question: OK. And who else do you owe?

Answer: Farmer's Home.

Question: Farmer's Home Administration?

Answer: Yes.

Question: And what is that against?

Answer: That's for operating loans and also for land notes.

Question: All right. And how much do you owe?

Answer: Total?

Question: Yes?

Answer: I'd say from 250 [$250,000.] to—you can check that out—to 275 [$275,000.], something like … [I pay

them] somewhere around $70,000 at the end of the year.

\* \* \* \* \* \*

Question: Well are you up to date, are you current or are you behind in any of these debts?

Answer: No, I'm current with them.

\* \* \* \* \* \*

Question: There's no mortgage against this house. Is that correct?

Answer: That's right.

\* \* \* \* \* \*

Question: Have you or your wife ever been sued or had a judgment rendered against you?

Answer: No. Wait now back up. Maybe we—I don't know whether what you're talking about or not, but anyway I had a … combine … one time. I had a little suit over that … I bought one that wouldn't work, so I give it back to them, but that's just minor stuff.

Question: But then the combine dealer sued you?

Answer: Yeah.

Question: Did you go to court on it?

Answer: Right. In fact we may be still going to court on it. I don't know what we're going to do with it.

Question: Did they find a judgment against you or?

Answer: For 21 or 22 hundred dollars …

Question: When did that take place?

Answer: Last year I believe.

Question: Any other judgments or suits?

Answer: No.

\* \* \* \* \* \*

Question: Have you or your wife or any members of your family ever had a previous fire loss?

Answer: Yes, about, there again eight or ten years ago. I had a trailer that burned.

Question: You had a trailer to burn?

Answer: Yes.

**2.** The non-waiver agreement provided that Nationwide was not waiving any of its defenses under law or the terms of the contract by investigating the cause or amount of the fire loss.

Question: A mobile home?

Answer: Mobile home ...

Question: Is that what you were living in before you got into your new house?

Answer: Right. But we were living in the new house when it burned ...

Question: OK, was the trailer insured?

Answer: Yeah, I had a little insurance on it.

Question: Who was the insurance company?

Answer: I couldn't a bit more tell you than nothing.

Question: Did the insurance company pay the claim?

Answer: Yes, sir.

Question: Do you remember how much they paid?

Answer: Seems like around $12,000, but now I'm not sure ...

Question: You don't remember what the name of the insurance company was?

Answer: No, I don't.

Questions: Or do you remember who the agent was, who handled your insurance business at that time?

Answer: No, I really don't. Because we changed ... you know so many different policies. Your farm equipment is one policy, you get trucks ... your home. I really don't, to be honest with you. We could probably check and find out for you.

\* \* \* \* \* \*

Question: OK. Have you ever had a policy cancelled or refused renewal?

Answer: No.

At trial, Stevenson testified that he saw nothing unusual or irregular in Mr. Dungan's responses to his questions. Mrs. Dungan agreed with the answers given by her husband. Stevenson then gave the Dungans a "personal property loss packet," which contained contents loss inventory forms and a blank sworn statement in proof of loss, and told them to complete the forms and submit them to Nationwide as soon as possible. Stevenson also gave the Dungans a check from Nationwide in the amount of $770 as an advance to help de-fray interim living expenses. He informed them that they could expect their check for the loss in some six weeks.

After meeting with the Dungans, Stevenson proceeded from Vicksburg to Port Gibson and thence to Fayette, Mississippi to perform a routine search of the courthouse records to verify ownership of the property. The search yielded much more. He gleaned from the records that FmHA held a mortgage on the Dungan residence. Stevenson then went to the Jefferson County office of the FmHA in Fayette and talked with James O. Taylor, FmHA County Supervisor, concerning the Dungans' mortgage. Taylor informed him that FmHA held a mortgage on the Dungans' home and that the Dungans were delinquent in payment of accounts owed to FmHA totalling $381,736.84. Taylor also informed Stevenson that such arrearage was not uncommon among farmers in the region. Stevenson produced to Taylor a waiver of records form signed by the Dungans, and Taylor allowed him to examine the Dungans' file. There Stevenson found an old insurance policy issued to the Dungans by United States Fidelity & Guaranty Company (USF & G) through the Gage Insurance Agency in Port Gibson. Back in Port Gibson and upon information provided by Gage employees, Stevenson learned that less than a month prior to the issuance of the Nationwide policy, USF & G had cancelled four policies of insurance which it had with the Dungans. These included a homeowner's policy in the names of Mr. and Mrs. Dungan covering their Pattison residence and an inland marine policy and two fire policies, all payable to Harold Dungan. The effective date of the USF & G policies was November 16, 1981, and they were cancelled effective December 28, 1981. Stevenson also learned that contrary to the statements contained on the Nationwide application, USF & G had paid Harold Dungan $54,500 on a bulldozer fire that occurred on April 9, 1981, and that Foremost Insurance Company had paid him for a total loss on a double-wide mobile home that burned on January 26, 1974, and some

$200 for a loss occasioned by lightning's striking the mobile home on May 18, 1971. Stevenson calculated that the debts owed by the Dungans as of July 25, 1984, including outstanding notes to the Federal Land Bank Association of Brookhaven, two Port Gibson banks and a Vicksburg bank, collectively totalled $464,470.56. At the conclusion of his testimony, Stevenson, who has been in the business of insurance claims adjusting since 1962, stated that he had "never seen a case with so much prior outstanding debt."

Based on the investigation by Stevenson, Nationwide exercised its right under the policy to demand that the Dungans submit to an examination under oath concerning the fire loss. The examination under oath was conducted on September 14, 1985. Mr. Dungan's responses to questions posed in the examination were adopted by Mrs. Dungan. The substance of pertinent parts of his responses were as follows: that his total outstanding debt to the FmHA was between $250,000 and $300,000; that their financial condition was "good"; that the only prior cancellations or non-renewals of insurance policies had been in connection with automobile policies; that the only prior losses he had suffered were fires in his trailer and his father's house, in which he was living at the time it burned; and that the contents loss inventory form was accurate. The examination under oath was never amended by the Dungans prior to trial.

On October 23, 1984, the Dungans submitted a sworn statement in proof of loss to Nationwide claiming coverage under the policy in the amount of $200,600 including in excess of $60,000 for loss of contents and home furnishings. The claim was forwarded to Ken Yeager, Nationwide's district claims manager for all of Mississippi, who determined, based upon advice of counsel, to deny the claim on November 9,

1984. Yeager testified at trial that the reasons for denial were as follows: (1) material misrepresentations existing on the application for insurance; (2) material misrepresentations in the Dungans' examination under oath; (3) material misrepresentations in the sworn statement in proof of loss, specifically in the contents inventory and amount; and (4) the recommendation of Bill Stevenson. On November 16, 1984, this action requesting declaratory relief was filed.

On September 21, 1984, Nationwide's counsel retained the services of Cecil Brown, a certified public accountant, to review the financial records of the Dungans. Brown testified at trial that his examination of the records indicated that the Dungans were in poor financial condition on the date of the fire, July 19, 1984, which condition continued to deteriorate thereafter. Such opinion directly contradicted Dungan's statement to Stevenson and in his examination under oath that his financial condition was "good." Brown further testified that, from his review of the Dungans' records, there was a poor probability of accuracy in the contents list submitted by the Dungans with their proof of loss. Brown was of the opinion that the Dungans could not have accumulated home contents and other personalty allegedly lost in the fire, totalling over $60,000, in the years immediately preceding the fire.

With reference to the position taken in this suit by the United States on behalf of the FmHA, the evidence is undisputed and this court finds as a fact that the Dungans did not list the FmHA as a mortgagee on their residence in the application, the policy or in subsequent documentation of their loss. The language of the "Mortgage Clause" of the policy issued to the Dungans specifically requires that any mortgagee claiming benefits under a policy must be named therein.[3] It was only dur-

---

3. The mortgage clause in the policy reads in pertinent part:

    12. Mortgage Clause

       If a mortgagee is named in this policy, any loss payable under Coverage A or B shall be paid to the mortgagee and you, as interests appear ...

The clause would thus appear to be of the type known as a "loss payable" or "open-mortgage" clause under Mississippi law. *Hartford Fire Ins. Co. v. Associates Capital Corp.*, 313 So.2d 404, 407 (Miss.1975).

ing the investigation by Bill Stevenson that the interest of the FmHA was disclosed.

The Dungans' version of the facts of this case is substantially at odds with the proof adduced by Nationwide. In defendants' case-in-chief, Mr. Dungan took the position that he informed Farrar of all previous fire losses, previous cancellations of his USF & G policies, the suit pending against him initiated by Rick Motors and the FmHA's mortgage on much of his land. To the extent that he may have neglected to inform Farrar of *all* previous losses or cancellations, particularly with regard to the bulldozer fire, a fire in a chicken house he owned and the prior USF & G cancellations, Dungan stated that he was under the impression that Farrar was asking only if he had any previous fire loss on his *home*, or if he had any *homeowner's* insurance cancelled. Dungan pled the same ignorance when confronted with answers he gave Stevenson in the initial statement taken in Vicksburg on July 24. In explanation of the fact that the application bears misinformation concerning his financial and insurance history, the Dungans contend that agent Farrar, motivated by blind desire to write the coverage and secure her commission, ignored the accurate answers given by Mr. Dungan.[4]

In support of their contention that accurate information was provided Farrar, the Dungans called Bill Nicholson at trial. Nicholson, a close friend of the Dungans for over 30 years, testified that he visited the Dungan home in January 1982, coincidentally on the very day and hour that Farrar and Whitlatch were present for purposes of taking the application. The substance of his testimony was as follows: that he drove alone from his home in Florence, Mississippi on a day-long ride through west Mississippi to visit friends and relatives; that he arrived at the Dungans' home in the late morning; that he saw a man, presumably

Whitlatch, sitting in a car with the motor running on the circular drive in front of the house; that Mrs. Dungan answered the door and led him into the den area; that Mr. Dungan and a lady, presumably June Farrar, were seated together on the couch; that the lady was apparently filling out a paper which she held in her lap; that Dungan and the lady did not stop talking when he came into the den, as Dungan was explaining to her about a bulldozer fire and trailer fire he had previously experienced; that Dungan introduced the lady as his insurance agent; that he went into the kitchen with Mrs. Dungan for coffee, where he was joined by Mr. Dungan some short time later; that he stayed another eight to ten minutes before leaving the house; and that none of the other persons he intended to visit that day were home.

■ The court is unable to credit Nicholson's testimony. Nicholson could recall no details about his visit to the Dungans—i.e., the make or color of car in which Whitlatch was allegedly sitting when Nicholson came to the door; the date or day of the week of his visit; anything about Farrar except that she was holding papers in her lap—except the specifics of a conversation in which he had no apparent interest. It is also incredible that, without phoning first, he would have driven from Florence to the Dungans' home, a distance of some 60 miles, in icy conditions, for an eight to ten minute social visit with Mr. Dungan. Additionally, Dungan testified that he had completely forgotten about Nicholson's visit on the day the application was taken until Nicholson volunteered his information in informal communications some six to eight months prior to trial. Nicholson did not talk with Dungan about the details of his recollection until Dungan's counsel had secured a statement from Nicholson for use in this litigation. The court also finds it convenient, at best, that no other party

---

**4.** The court notes that on the day Farrar and Whitlatch came to the Dungan home to take the application, Dungan also showed them a rental home and a deer camp cabin he owned in the vicinity and requested that Nationwide provide coverage for these houses. After brief inspec-

tion, Farrar denied the requested coverage. Had she been motivated by a desire to come away with the largest premium check she could get, as suggested by the Dungans, it is logical to assume that she would have bound the coverage on those houses as well.

whom Nicholson had intended to visit that day was home. The testimony of Farrar and Whitlatch concerning the taking of the application directly contradicted Nicholson's testimony, and the court, as finder of fact, credits the testimony of Farrar and Whitlatch as more consistent with logic.

Alternatively, the Dungans contend that if there were misrepresentations made by Dungan in responding to questions on the application, any such misrepresentations were not material; that is, Nationwide would have written the coverage notwithstanding the Dungans' prior losses, cancellations, suits or judgments and mortgages. Ken Yeager, Nationwide's district claims manager, and Sherry E. Crenshaw, a senior personal lines underwriter for Nationwide, did testify that it was common practice to accept risks involving prior outstanding debt or mortgages on the home, or an outstanding suit or judgment against the applicant. However, Crenshaw testified that she would not have accepted the coverage had the application indicated that the Dungans had suffered prior fire losses, or that USF & G had cancelled four policies within a month before Dungan submitted his application to Nationwide. Crenshaw testified, and common sense would indicate, that the answers provided on the application are "crucial" to the underwriter in seeking to determine acceptable risks.

In support of their counterclaim for breach of contract and "bad faith" denial of payment by Nationwide, the Dungans contend that the insurance company has a duty to investigate the responses given on an application at the beginning of the relationship with the insured. Waiting until after a claim is made to investigate the veracity of an insured's responses on his application constitutes bad faith, defendants assert. No evidence of any loss on the part of the Dungans, other than the limits of the coverage in the policy, was adduced at trial. The record is devoid of any proof of the financial net worth of Nationwide.

## CONCLUSIONS OF LAW

Under Mississippi law, misstatements of material fact in an application for insurance provide grounds for declaring a policy issued in reliance thereon void *ab initio*. *Dukes v. South Carolina Insurance Co.*, 590 F.Supp. 1166, 1168–69 (S.D.Miss.1984) *aff'd* 770 F.2d 545 (5th Cir.1985). *See also Colonial Life & Accident Insurance Co. v. Cook*, 374 So.2d 1288, 1292 (Miss.1979); *Tolar v. Bankers Trust Savings & Loan Ass'n*, 363 So.2d 732, 735 (Miss.1978); *Prudential Insurance Co. of America v. Estate of Russell*, 274 So.2d 113, 116 (Miss. 1973). Where there is proof that the application contains material misstatements of fact, as here, there is no requirement that the insurance company prove *intent* to misrepresent material facts on the part of the insured. *Dukes*, 590 F.Supp. at 1169. The court in *Dukes*, quoting from *Fidelity Mutual Life Insurance Co. v. Miazza*, 93 Miss. 18, 20, 46 So. 817, 819 (1908), stated:

It is the universal rule that any contract induced by misrepresentation or concealment of material facts may be avoided by the party injuriously affected thereby. If the applicant for insurance undertakes to make a positive statement of fact, if it be material to the risk, such fact must be true. It is not sufficient that he believes it true, but it must be so in fact, or the policy will be avoided. Provided, always, that the misstatement be about a material matter. If the applicant is not informed as to any question asked in the application, he should so state, and there can be no misrepresentation.

590 F.Supp. at 1168.

The court further stated:

Because no genuine issue of a material fact remains, the Plaintiff's suit must fail in that the policy of insurance should be declared void *ab initio*. This is simply a general principle of contract law which the special nature of insurance contracts does not alter. The parties entered into this contract under a mistake of fact. Had that mistake been shown the insurance company would not have written the policy. Whether the fact was

intentionally or unintentionally misstated by the Plaintiffs is unimportant.

590 F.Supp. at 1169.

■■■■ This is precisely the issue presented to this court by the proof. It cannot be denied with any reasonable degree of candor that Nationwide would not have underwritten the coverage had the Dungans presented Farrar all material facts called for in the questions on the application. That Mr. Dungan may have been confused concerning the nature and extent of the information requested by Farrar is perhaps understandable, but is no defense to the company's right to avoid a policy that was issued in reliance on material misrepresentations. The duty to speak up in the event of confusion was on Dungan. Even assuming that Dungan was in fact unaware of the FmHA mortgage on his home, he clearly knew of the prior fire losses and the cancellation of four USF & G policies less than a month prior to Farrar's visit. By refusing or neglecting to volunteer such information to Farrar when the questions she asked unequivocally solicited information of this type, Dungan materially misrepresented his financial condition in the application. Therefore, the court is of the opinion that Nationwide has no liability on the policy issued to the Dungans in reliance upon Mr. Dungan's material misrepresentations in the application.

Nationwide also contends, alternatively, that the policy was rendered void by the Dungans' failure to cooperate in the investigation of the claim and by their violation of the clause in the policy prohibiting misrepresentation and concealment. This court has previously had occasion to examine the nature of an insured's duty to cooperate in the investigation of a claim and the validity of avoiding a policy upon proof of material misrepresentation by the insured during an investigation. In *Clark v. Aetna*

*Casualty & Surety Co.*, 607 F.Supp. 63 (S.D.Miss.), *aff'd*, 778 F.2d 242 (5th Cir. 1985), this court determined that the insured made false material statements with the intent to deceive during the investigation of his claim, entitling the insurance company to declare the policy void under the misrepresentation clause of the policy.[5] The analysis undertaken in *Clark*, both by this court and on appeal, is applicable here.

Material misrepresentation clauses are reasonable and valid under Mississippi law and are to be given a reasonable interpretation. *Clark*, 607 F.Supp. at 66 (quoting *Southern Guaranty Insurance Co. v. Dear*, 252 Miss. 69, 172 So.2d 553 (1965)). In Mississippi, for an insurance company to defeat a policy on the basis of a "concealment" clause, it must establish that statements by the insured were (1) false *and* (2) material *and* (3) knowingly and willfully made. *Clark*, 778 F.2d at 245 (emphasis original) (citing *Watkins v. Continental Insurance Co.*, 690 F.2d 449 (5th Cir.1982)). The Mississippi Supreme Court "takes a broad view of materiality" in this context. *Clark*, 607 F.Supp. at 66, 778 F.2d at 246 (quoting *Edmiston v. Schellenger*, 343 So.2d 465 (Miss.1977)). The following types of statements have been held material for purposes of avoiding liability under a concealment clause: false answers as to the insured's location at the time of the fire, *Edmiston*, 343 So.2d at 466; refusing to give answers to an insurance company investigator following a fire, *Taylor v. Firemans Fund Insurance Co.*, 306 So.2d 638, 644–45 (Miss.1974); refusing to answer inquiries about financial matters, *Southern Guaranty*, 172 So.2d at 554–56.

■■■■ In both the interview with Stevenson on July 24 and the examination under oath on September 14, Dungan withheld or concealed information relating to the extent of his previous fire losses (not until

---

5. In *Clark* the insured sued to recover payment under a policy of insurance issued by Aetna covering certain farm equipment owned by plaintiff that was destroyed by fire. During investigation of the claim, Clark claimed that he had bought several pieces of equipment from friends and family members, and he produced fraudulent bills of sale for the equipment. The proof showed that he had paid nothing for many of the items for which he sought coverage. This court found that such concealment and misrepresentation was willful, and the requisite intent to deceive was implied. 607 F.Supp. at 67.

trial did Dungan reveal that he had a bulldozer fire in the spring of 1981 for which he received insurance payments), the December 1981 cancellations of four policies by USF & G, his financial condition and the extent of his debts, and the mortgage on his home held by the FmHA. The statements Dungan gave were thus incomplete in places where they were not blatantly false. Beyond the statements he did give, Dungan was silent or concealed facts in response to questions seeking information he knew or should have known. Dungan thus knew that he was giving false answers. Under such circumstances, there is no requirement that Nationwide introduce evidence of Dungan's intent to deceive, for "[w]here false and material statements are knowingly and willfully made, 'the intent to deceive will be implied.'" *Edmiston*, 343 So.2d at 467 (quoting *Claxton v. Fidelity & Guaranty Fire Corp.*, 179 Miss. 556, 566, 175 So. 210, 212 (1937)). Therefore, the court is of the opinion that Nationwide sustained its burden of proving intentional concealment by the Dungans during the investigation of the fire loss in violation of the concealment clause of the policy. Accordingly, Nationwide is entitled to declaratory judgment that it was within its rights granted in the policy and under Mississippi law when it denied payment.

The FmHA asserts in this action that it is entitled to recover the proceeds of the policy because of the deed of trust executed to it by the Dungans covering the home. As stated, however, the policy issued to Dungan by Nationwide did not name the FmHA as mortgagee, and Nationwide did not discover the interest of FmHA until Stevenson undertook investigation of the Dungans' claim. The FmHA contends that it is entitled to the protection provided mortgagees in Miss.Code Ann. § 83–13–9 (1972) regardless of the fact that the policy contained no mortgage clause naming it as mortgagee.[6] Citing *National Security Fire & Casualty Co. v. Mid-State Homes, Inc.*, 370 So.2d 1351 (Miss.1979), FmHA

contends that the statute is automatically written in to a fire insurance policy wherein the insured is a grantor of a deed of trust, as a matter of public policy.

■ The Nationwide policy issued to the Dungans was a homeowner's policy with fire protection and not exclusively a fire policy. The court cannot give the statute such broad construction in the absence of a mortgage clause naming FmHA in the Dungans' policy. The general rule was stated in *Employers Mutual Casualty Co. v. Standard Drug Co.*, 234 So.2d 330 (Miss. 1970):

> [I]f the mortgagor covenants to keep the mortgaged property insured for the better security of the motgagee [sic], the latter will have an *equitable lien* upon the proceeds of insurance carried by the mortgagor, in case of a loss, to the extent of his interest in the property destroyed, even though the policy contains no mortgage clause and is payable to the mortgagor.

234 So.2d at 333 (emphasis added).

In *Calvert Fire Insurance Co. v. Environs Development Corp.*, 601 F.2d 851 (5th Cir.1979), the Fifth Circuit quoted the rule stated in *Standard Drug* in support of the proposition that a mortgagee not named in a policy has only an equitable lien on insurance proceeds paid to the insured mortgagor, and further stated:

> The general rule is that a mortgagee or lienholder has no claim to the benefit of a fire insurance policy unless he has been named loss-payee or the policy has otherwise been assigned to him.

601 F.2d at 858 (citing *Wheeler v. Factors' and Traders' Insurance Co.*, 101 U.S. (11 Otto) 439, 25 L.Ed. 1055 (1880)).

■ Furthermore, the blank mortgage clause in the Dungan policy appears to the court to be a simple "loss-payable" or "open-mortgage" clause payable to the mortgagee "as his interest may appear." Under Mississippi law, and even assuming

---

**6.** Miss.Code Ann. § 83–13–9 provides in part: Each fire insurance policy taken out by a mortgagor or grantor in a deed of trust shall have attached or shall contain substantially the following mortgagee clause, viz ...

that FmHA had been named in the policy, FmHA, as mortgagee, is only entitled to receive the amount due it on its mortgage out of funds recovered by or due the insured, and the loss-payable clause does not make the mortgagee a party to the contract. *Hartford Fire Insurance Co. v. Associates Capitol Corp.*, 313 So.2d 404, 407 (Miss.1975).

Thus, the court concludes that FmHA, because it was not named in the policy, occupies the status of a mere equitable lienholder as to the insurance proceeds. The right of a holder of an equitable lien on insurance proceeds to recover such proceeds is solely contingent on and derivative of the insured's right to recover. *Calvert Fire Insurance Co.*, 601 F.2d at 858. See also *Whitney National Bank v. State Farm Fire & Casualty Co.*, 518 F.Supp. 359, 362 (E.D.La.1981). An unlisted or unnamed mortgagee likewise retains only an equitable lien on insurance proceeds and remains subject to any defenses which the insurer may assert against the mortgagor. *Cottrell v. Clark and Citizens Mutual Insurance Co.*, 337 N.W.2d 58, 61 (Mich.App.1983). Lastly, even if FmHA were named in the policy, the mortgage clause appears to be a "loss payable" or "open mortgage" clause, which makes the mortgagee's right to recover contingent on the mortgagor's right to recover. *Hartford Fire*, 313 So.2d at 407.

Accordingly, the court is of the opinion that FmHA is not entitled to recover the proceeds of the Nationwide policy issued to the Dungans because it occupies the status of an equitable lienholder and is thus subject to the material misrepresentation defense asserted against the Dungans by Nationwide.

The Dungans' counterclaim for breach of contract and punitive damages fails as a matter of proof and as a matter of law [7] for the reasons previously cited by this court in support of its conclusion that

Nationwide is entitled to a declaratory judgment in its favor.

CONCLUSION

For the reasons stated herein, the court concludes that Nationwide is entitled to a declaratory judgment in its favor to the effect that it has no liability to either the Dungans or FmHA on the policy of insurance. The Dungans' counterclaim for breach of contract and punitive damages should therefore be dismissed with prejudice, and the motion of the United States on behalf of the FmHA for declaratory judgment that it is entitled to recover its interest as mortgagee on the Dungan home under the policy of insurance should be denied. A separate judgment conforming with this opinion shall be entered according to the local rules.

---

7. Lack of coverage under the policy is a legitimate or arguable reason for denial of a claim. *Mixon v. Provident Life & Acc. Ins. Co.*, 616 F.Supp. 139, 141–42 (S.D.Miss.1985), *aff'd* 783 F.2d 1061, (5th Cir.1986). Because coverage was not available under the circumstances, Nationwide is not liable for punitive damages under Mississippi law.